# Illinois Official Reports

## Appellate Court

---

*People v. Ortiz*, **2016 IL App (1st) 133294**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ERICK ORTIZ, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-13-3294 |
| Filed | October 17, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-16082; the Hon. Maura Slattery Boyle, Judge, presiding. |
| Judgment | Sentence vacated and cause remanded; mittimus corrected. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Elena B. Penick, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Janet C. Mahoney, Noah Montague, and Sheilah O'Grady-Krajniak, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.[*]<br>Presiding Justice Connors and Justice Cunningham concurred in the judgment and opinion. |

---

[*]Notice of appeal was filed on October 23, 2013. However, due to extensive supplemental brief filings, the case was not ready for determination until February 2, 2016, and assigned to Justice Liu as authoring justice. As a result of Justice Liu's death, this case was assigned to authoring Justice Harris on or about May 1, 2016.

**OPINION**

¶ 1        Defendant Erick Ortiz was sentenced to 60 years' imprisonment for first degree murder. Defendant was 15 years old when the crime occurred. On appeal, defendant contends that his sentence must be vacated and the matter remanded for resentencing because (1) his sentence resulted from a statutory scheme that violates the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution and (2) the trial court abused its discretion in sentencing him to a *de facto* life sentence that is 25 years above the required minimum. Defendant also contends that two of his three murder convictions should be vacated under the one-act, one-crime rule. For the following reasons, we vacate defendant's sentence and remand for resentencing. We also order the mittimus corrected to reflect only one murder conviction.

¶ 2                                    JURISDICTION

¶ 3        The trial court sentenced defendant on August 23, 2013. He filed a motion to reconsider sentence, which the trial court denied on September 16, 2013. His notice of appeal was filed on September 30, 2013. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Oct. 1, 2010) and 606 (eff. Mar. 20, 2009), governing appeals from a final judgment of conviction in a criminal case entered below.

¶ 4                                    BACKGROUND

¶ 5        Defendant was charged with first degree murder, and other offenses, in connection with the death of 15-year-old Alex Arellano. His codefendant, Jovanny Martinez, was also charged with first degree murder. On May 1, 2009, the day of the incident, Martinez was arrested and had in his possession a gun that subsequently was determined to have fired a bullet recovered from the victim. Martinez's clothing also contained stains of the victim's blood and his pants tested positive for gunshot residue. Defendant was arrested several months later and admitted his involvement in the murder in a videotaped statement, portions of which were published at his trial.

¶ 6        In the statement, defendant stated that he is a member of the Latin Kings, and on May 1, 2009, he had heard that the victim, a "flake" or person who was not a Latin King, was in their territory. He had a shag hairstyle and had been warned to get out of the area or he would be killed. The victim laughed and did not leave the area, which defendant said was "stupid." Arming himself with a rock, defendant got into a car with friends to try to find this flake. When they found him, he was with two girls. Defendant and his group asked the victim who he was with and to make certain gang signs. He refused and defendant "did it the right way" and continued to confront him. One of defendant's friends pulled out a baseball bat and others in the car came out and they started beating the victim. When the victim tried to run away, defendant threw a rock at his back. Defendant's friends yelled "hit him with the car!" The victim stood up after being struck by the car and stood still, seemingly waiting for defendant to hit him. Defendant then hit the victim in the face. The others came and started hitting the victim. The group separated and defendant found himself alone with the victim. A neighbor came out and said to get the victim out of there and to take him to the hospital. Defendant grabbed the victim and dragged him down into the gangway to avoid getting into trouble.

Martinez joined defendant and punched the victim. Defendant pulled the victim "all the way back" into the gangway and closed the door. When he turned around, he saw Martinez with his gun drawn. Defendant told Martinez not to shoot the victim, but Martinez fired at the victim's head. Defendant told Martinez to put the body in a garbage can or in a nearby pool, but Martinez just wanted to get out of there. When defendant returned the next morning to check on the victim's body he found it was badly burned. Defendant did not know who burned the body.

¶ 7 The trial court found defendant guilty of first degree murder, finding that defendant and his group attempted "to terrorize a community and individual" and held the misconception "that part of the City of Chicago actually belonged to you." The trial court acknowledged that defendant told Martinez not to shoot the victim but concluded that it "doesn't alleviate him of the ultimate consequence, the ultimate actions of what all of them did out there that afternoon."

¶ 8 Defense counsel filed a motion for a new trial, which the trial court denied. At defendant's sentencing hearing, the State presented evidence in aggravation. A Cook County correctional officer testified about an incident on May 29, 2013, where defendant struck another detainee in the head with a slashing motion and had to be pepper sprayed. A 3½-inch metal shank was found nearby and the detainee was bleeding from his head. The correctional officer also testified about another incident where defendant was found possessing a shank and an incident involving a fistfight. The State argued that defendant was "most significantly likely to recommit violen[t] offenses if he's released."

¶ 9 In mitigation, defense counsel highlighted defendant's troubled childhood as detailed in the presentence investigation report (PSI). The report stated that defendant was born in Chicago on November 27, 1993. Defendant had no prior juvenile adjudications or adult convictions. Defendant's neighborhood is characterized by violence and "gang banging," and he does not know the identity of his biological father. He has never had a father figure present in his life and he described his relationship with his mother as "bad." His mother abused alcohol and drugs throughout his life and was both physically and emotionally abusive toward her children. He stated that "[s]he used to call me a piece of s***—that was my official name." He was taken into the custody of the Department of Children and Family Services (DCFS) when he was six years old. He was in DCFS custody for two years before he returned to his mother's care. Defendant is the oldest of his mother's children.

¶ 10 Defendant started drinking alcohol at the age of eight, and he consumes alcohol four times a week. He stated that no one has expressed concern about his alcohol use, and he did not think it affected his education. He also smoked marijuana at the age of 9 and used cocaine when he was 11 years old. In 2008, he was stabbed by members of the Satan Disciples street gang, and that same year, he joined the Latin Kings. Defendant was expelled from high school in ninth grade for "fights and ditching school" but has been attending school while incarcerated. Defendant "tried to cut [him]self" while in the juvenile temporary detention center.

¶ 11 Before sentencing defendant, the trial court noted that defendant and his group "hunt[ed]" down the victim when he came into Latin Kings territory. It found the notion that an area "belongs" to a gang "absurd" because "[t]he streets are for everyone." It stated that what defendant and his group did to the victim was "unfathomable" and that they lacked acknowledgment that one's actions bear consequences. The trial court also recognized that defendant had "a difficult upbringing" and his parents "allowed" him to quit school or run the streets. However, it stated that "everybody is accountable" and defendant is "going to pay the

price here physically by being incarcerated." The trial court stated that defendant knew what he did to the victim was wrong and "[defendant's] pain or what [he] endured does not excuse [his] infliction of pain on another human being or another person." The trial court also noted defendant's continued violent conduct while incarcerated and that he showed "no acknowledgment, no remorse."

¶ 12    The trial court also stated that it took into consideration "mitigating factors such as the age of the offender at the time of the occurrence, the factors *** in regard to his lack of parenting, lack of familiar structure, of his upbringing being in DCFS custody and so forth." The trial court sentenced defendant to 60 years' imprisonment followed by 3 years' mandatory supervised release. Defense counsel filed a motion to reconsider sentence, which the trial court denied. Defendant filed this timely appeal.

¶ 13                                        ANALYSIS

¶ 14    In his initial appellate brief, defendant contended that his sentence of 60 years' imprisonment is the product of an unconstitutional sentencing scheme. He argued that the United States Supreme Court case of *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012), found mandatory sentencing schemes that prevent the sentencing court from considering a juvenile defendant's youth before imposing a harsh sentence violate the eighth amendment. Subsequent to defendant's filing of this appeal, the Supreme Court issued its decision in *Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718 (2016), and the First District case of *People v. Nieto*, 2016 IL App (1st) 121604, was filed. On March 28, 2016, defendant filed a motion to cite these cases as additional authority, which this court allowed. In the motion, defendant argued that according to *Montgomery* and *Nieto*, if a convicted juvenile received a life sentence without parole, the sentencing court must have taken into account the characteristics of youth for the sentence to comply with the eighth amendment, even where imposition of the life sentence was discretionary rather than mandatory.

¶ 15    Defendant argued that his sentence of 60 years' imprisonment, to be served at 100%, was a *de facto* life sentence. Since the trial court did not consider the required youth factors outlined in *Montgomery*, he contended that his sentence violated the eighth amendment. Although defendant's brief argues the constitutionality of the sentencing statute on its face, his supplemental argument incorporating *Montgomery* and *Nieto* is an "as-applied" constitutional challenge. Defendant did not raise this constitutional issue below; however, we consider the issue since the forfeiture rule does not apply to as-applied challenges to a statute. *People v. Emmett*, 264 Ill. App. 3d 296, 297 (1994); *People v. Burnett*, 2015 IL App (1st) 133610, ¶ 82.

¶ 16    In *Miller*, 567 U.S. at ___, 132 S. Ct. 2475, the Supreme Court determined that the eighth amendment prohibits the mandatory sentencing of a juvenile to life in prison without parole, even if the juvenile defendant was convicted of murder. In *Montgomery*, the Supreme Court elaborated on its ruling in *Miller*. It noted that the "central substantive guarantee" of the amendment is protection against disproportionate punishment and that *Miller* was based on a "line of precedent holding certain punishments disproportionate when applied to juveniles." *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 732. The Supreme Court further found that this eighth amendment protection "goes far beyond the manner of determining a defendant's sentence." *Id.* at ___, 136 S. Ct. at 732-33.

¶ 17    The Supreme Court analyzed its principle premise in *Miller* that " 'children are constitutionally different from adults for purposes of sentencing' " due to their " 'diminished

culpability and greater prospects for reform.' " *Id.* at ___, 136 S. Ct. at 733 (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464). In noting these differences, the Court quoted the following from *Miller*:

"First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. Second, children are more vulnerable to negative influences and outside pressures, including from their family and peers; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity." (Internal quotation marks omitted.) *Id.* at ___, 136 S. Ct. at 733 (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464).

¶ 18     Not only do these characteristics diminish a juvenile's culpability, but these " 'distinctive attributes of youth diminish the penological justifications' for imposing life without parole on juvenile offenders.' " *Id.* at ___, 136 S. Ct. at 733 (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2465). The rationale of punishment as deterrence for juveniles is less compelling since " 'the same characteristics that render juveniles less culpable than adults—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment.' " *Id.* at ___, 136 S. Ct. at 733 (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2465). Likewise, the need to incapacitate a juvenile offender is lessened because his developing maturity means he will less likely be a danger to society "forever." (Internal quotation marks omitted.) *Id.* at ___, 136 S. Ct. at 733. Furthermore, a sentence of life in prison without parole cannot take into account the greater rehabilitative potential of juveniles. *Id.* at ___, 136 S. Ct. at 733. Therefore, *Miller* concluded that a mandatory sentence of life without parole posed "too great a risk of disproportionate punishment" and required that before imposing such a sentence, the sentencing judge consider "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (Internal quotation marks omitted.) *Id.* at ___, 136 S. Ct. at 733 (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469).

¶ 19     The Supreme Court elaborated that *Miller* found the sentencing of a juvenile to life without parole "excessive for all but the rare juvenile offender whose crime reflects irreparable corruption." (Internal quotation marks omitted.) *Id.* at ___, 136 S. Ct. at 734 (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469). Therefore, "[e]ven if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects 'unfortunate yet transient immaturity' " of youth rather than "irreparable corruption." (Internal quotation marks omitted.) *Id.* at ___, 136 S. Ct. at 734 (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469). In order to comply with the eighth amendment's prohibitions, the judge at a sentencing hearing must consider "youth and its attendant characteristics" so that juveniles who may be sentenced to life without parole can be separated from those who may not. (Internal quotation marks omitted.) *Id.* at ___, 136 S. Ct. at 735. The Supreme Court noted that the sentencing judge need not make an explicit finding of incorrigibility, and left for the states to determine how to enforce this constitutional restriction on the imposition of juvenile sentences. *Id.* at ___, 136 S. Ct. at 735.

¶ 20     In *Nieto*, a division of this court relied on *Montgomery* in determining that *Miller*'s prohibition against mandatory life sentences without parole for juveniles also applies to discretionary life sentences without parole. In *Nieto*, the 17-year-old defendant received a

sentence of 35 years' imprisonment for first degree murder, 25 years for discharge of a firearm, and 18 years for aggravated battery with a firearm, to be served consecutively, in the shooting death of Richard Soria. *Nieto*, 2016 IL App (1st) 121604, ¶¶ 4, 12. After receiving credit, the defendant would have to serve 75.3 years of his sentence. *Id.* ¶ 13.

¶ 21    The *Nieto* court reasoned that *Montgomery*'s procedural requirement for sentencing hearings merely enables a juvenile defendant to show that he falls within the protected class of persons for whom the eighth amendment prohibits a particular form of punishment. *Id.* ¶ 47. As discussed above, the prohibited punishment is life in prison without parole which the sentencing judge imposed on a juvenile defendant without consideration of "youth and its attendant characteristics." (Internal quotation marks omitted.) *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 735 (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2460). The *Nieto* court recognized that *Montgomery* did not distinguish between mandatory life sentences without parole and life sentences imposed as an exercise of discretion. *Nieto*, 2016 IL App (1st) 121604, ¶¶ 46, 49.

¶ 22    The juvenile defendant in *Nieto* was sentenced to 78 years in prison although the minimum sentence he could have received was 51 years. *Id.* ¶ 43. As the *Nieto* court noted, he "effectively received a sentence of natural life without parole." See *id.* ¶ 42. While the sentencing judge considered the defendant's young age, it "did not consider the corresponding characteristics of [his] youth" as required by *Montgomery*. *Id.* ¶ 56. Therefore, the court vacated the defendant's sentence and remanded the cause for resentencing. *Id.* ¶ 57. The court recognized that the Illinois Supreme Court and other Illinois courts "have interpreted *Miller* differently prior to *Montgomery*" and that "the Illinois Supreme Court has not yet had the opportunity to address the impact of *Montgomery*." *Id.* ¶ 50. However, the court in *Nieto* felt "compelled to follow the United States Supreme Court's most recent pronouncement on this matter." *Id.*

¶ 23    We agree with *Nieto*'s well-reasoned analysis. Accordingly, we hold that for a juvenile's mandatory or discretionary sentence of life in prison without parole to be constitutionally valid, the sentencing judge must take into consideration his "youth and attendant characteristics" to determine whether the defendant is "the rarest of juvenile offenders *** whose crimes reflect permanent incorrigibility." (Internal quotation marks omitted.) *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734. We find further support for this interpretation in our legislature's recent enactment of section 5-4.5-105 of the Juvenile Court Act of 1987 (730 ILCS 5/5-4.5-105(a)(1)-(a)(3) (West Supp. 2015), effective January 1, 2016, and applicable to offenses committed on or after the effective date. This section provides that for defendants who were under the age of 18 when they committed their offenses, the court shall consider in the sentencing hearing factors reflecting characteristics of youth (impetuosity, level of maturity, the ability to consider risks and consequences); whether they were subjected to outside pressures, "including peer pressure, familial pressure, or negative influences"; and their home environment, family and "any history of parental neglect, physical abuse, or other childhood trauma."

¶ 24    Here, the juvenile defendant was sentenced to 60 years in prison for first degree murder. Pursuant to section 3-6-3(a)(2)(i) of the Unified Code of Corrections (730 ILCS 5/3-6-3(a)(2)(i) (West 2014)), "a prisoner who is serving a term of imprisonment for first degree murder *** shall receive no sentence credit and shall serve the entire sentence imposed by the court." Since defendant will not be eligible for release until he is 75 years old, his

sentence is effectively a life sentence without parole. Before sentencing defendant, the trial court recognized that defendant had "a difficult upbringing" and his parents "allowed" him to quit school or run the streets. However, it stated that "everybody is accountable" and defendant is "going to pay the price here physically by being incarcerated." The trial court believed that defendant knew what he did to the victim was wrong and "[defendant's] pain or what [he] endured does not excuse [his] infliction of pain on another human being or another person." He lacked acknowledgment that his actions bear consequences, and he showed no remorse.

¶ 25    Although the trial court considered defendant's young age and his personal history, the record does not indicate that the court considered the corresponding characteristics of his youth as outlined in *Miller* and *Montgomery* or their effect on his conduct. We acknowledge that defendant has admitted he engaged in violent and aggressive conduct leading to the death of Alex Arellano. We also recognize that the trial court did not have the benefit of the *Montgomery* decision when it sentenced defendant in 2013. We emphasize that in vacating defendant's sentence and remanding the cause for resentencing, we make no determination as to the proper sentence to be imposed. We determine only that pursuant to *Montgomery*, before imposing a sentence of, in effect, life in prison without parole upon a juvenile defendant, the trial court must consider "the attendant characteristics of youth."

¶ 26    While this appeal was pending, another division of this court issued its opinion in *People v. Patterson*, 2016 IL App (1st) 101573-B. Defendant filed a motion to cite *Patterson* as additional authority, we granted the motion and the State filed a response. In *Patterson*, the defendant was 15 years old when he was convicted of aggravated criminal sexual assault and sentenced, as an adult, to 36 years in prison. Since the defendant was subject to the automatic transfer provision at the time of the offense, the State did not file a motion for a discretionary transfer hearing. The appellate court noted that subsequent to the defendant's conviction in criminal court, and while his appeal was pending, the legislature amended sections 5-130 and 5-805 of the Juvenile Court Act of 1987 (705 ILCS 405/5-130, 5-805 (West Supp. 2015)). Section 5-130 raised the minimum age for mandatory transfer to criminal court on certain offenses from 15 to 16 years old. Section 5-805 concerned the discretionary transfer of juvenile defendants from juvenile court to criminal court. *Patterson*, 2016 IL App (1st) 101573-B, ¶¶ 11-13.

¶ 27    The *Patterson* court then considered whether the amendments applied retroactively to the defendant in its case. It determined that since the legislature did not provide an explicit provision establishing the effective date of these amendments, the general savings clause of section 4 of the Statute on Statutes (5 ILCS 70/4 (West 2014)) applied. As our supreme court in *Caveney v. Bower*, 207 Ill. 2d 82, 92 (2003), found, "section 4 represents a clear legislative directive as to the temporal reach of statutory amendments and repeals: those that are procedural in nature may be applied retroactively, while those that are substantive may not." The *Patterson* court determined, following previous cases (*In re M.C.*, 319 Ill. App. 3d 713, 719 (2001); *People v. Pena*, 321 Ill. App. 3d 538, 543-44 (2001)), that the transfer of juvenile cases to criminal court are procedural provisions that may be applied retroactively. *Patterson*, 2016 IL App (1st) 101573-B, ¶ 15. Since the defendant did not receive a discretionary transfer hearing, the *Patterson* court affirmed his convictions, but vacated his sentence and remanded the cause to the juvenile court to allow the State to file a petition for a discretionary transfer hearing pursuant to the Act. *Id.* ¶ 23.

¶ 28    The State, however, asks that this court follow *People v. Hunter*, 2016 IL App (1st) 141904, filed after *Patterson*, which found that the amendment to section 5-130 of the Juvenile Court Act of 1987 should not be applied retroactively. Like the defendant in *Patterson*, the defendant in *Hunter*, who was also 15 years old at the time of the offense and convicted prior to enactment of the amendment, argued on appeal that the amendment to section 5-130 applied retroactively to his case, and he should be resentenced in juvenile court because the State never filed a petition to transfer his case. *Id.* ¶ 67.

¶ 29    To determine whether section 5-130 applied retroactively, the court in *Hunter* followed the approach set forth by the United States Supreme Court in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), which our supreme court adopted in *Commonwealth Edison Co. v. Will County Collector*, 196 Ill. 2d 27, 38 (2001). In a *Landgraf* analysis, courts first look at whether the legislature has clearly indicated the temporal reach of an amendment. *Id.* If the legislature has so indicated, courts must give effect to that legislative intent absent a constitutional prohibition. *Id.* If no temporal reach was indicated, courts must then determine whether the amendment has a retroactive impact (whether it would impair a party's rights he had when he acted, increase a party's liability for past conduct, or impose new duties on transactions already completed). *Id.* If there is no impact, the amendment may be applied retroactively. *Id.*

¶ 30    However, in *Caveney*, our supreme court revisited the retroactivity issue and the *Landgraf* analysis. With respect to the first step of the analysis, the court noted that in *People v. Glisson*, 202 Ill. 2d 499, 505 (2002), it found that section 4 of the Statute on Statutes acts as " 'the general saving clause of Illinois' " through which the legislature "has clearly indicated the 'temporal reach' of *every* amended statute." (Emphasis in original.) *Caveney*, 207 Ill. 2d at 92. *Glisson* construed the language in section 4 as allowing the retroactive application of amendments or repeals if the changes are procedural in nature, while substantive changes may not be retroactively applied. *Id.* Our supreme court concluded that "[i]n light of section 4, the *Landgraf* analysis in Illinois becomes quite simple. Indeed, with respect to a statutory amendment or repeal, it is virtually inconceivable that an Illinois court will ever go beyond step one of the *Landgraf* approach" because "the legislature *always* will have clearly indicated the temporal reach of an amended statute, either expressly in the new legislative enactment or by default in section 4 of the Statute on Statutes." (Emphasis in original.) *Id.* at 94-95. This determination applies to both criminal and civil statutory enactments. *Id.* at 92-93.

¶ 31    In a concurring opinion, Justice Freeman noted the majority opinion's "expansive holding" and questioned whether its interpretation of section 4 as a general savings clause for purposes of the *Landgraf* analysis was proper. *Id.* at 98, 100-03 (Freeman, J., specially concurring, joined by McMorrow, C.J., and Kilbride, J.). Justice Freeman believed that "the better approach" would be to apply the two-step *Landgraf* analysis as adopted by the court in *Commonwealth Edison*. *Id.* at 103. However, in the subsequent case of *Allegis Realty Investors v. Novak*, 223 Ill. 2d 318 (2006), our supreme court reaffirmed its holding in *Caveney*. In *Allegis*, the court found that "[a]fter adopting the *Landgraf* framework, [it] considered the effect of section 4" on the retroactivity analysis. *Id.* at 331. The court reiterated its determination that in light of section 4, "an Illinois court need never go beyond step one of the *Landgraf* test" "because the legislature will always have clearly indicated the temporal reach of an amended statute, either expressly in the new legislative enactment or by default in section 4 of the Statute on Statutes." *Id.* at 332.

¶ 32    In *Hunter*, another division of this court determined that *Caveney* did not require the retroactive application of procedural amendments, and recent supreme court opinions (*Hayashi v. Illinois Department of Financial & Professional Regulation*, 2014 IL 116023; *People ex rel. Madigan v. J.T. Einoder, Inc.*, 2015 IL 117193) clearly indicate that a retroactive impact analysis remains an important consideration. *Hunter*, 2016 IL App (1st) 141904, ¶¶ 75-77. Therefore, the *Hunter* court declined to follow *Patterson*'s holding that section 4 of the Statute on Statutes sanctioned the retroactive application of procedural amendments without need to conduct the second step of the *Landgraf* test (analysis of retroactive impact). *Id.* Instead, it conducted both steps of the *Landgraf* test and found that the amendment to section 5-130 should not be applied retroactively because doing so would have a retroactive impact "as it would impose new duties with respect to transactions already completed and attach new legal consequences to events completed before the statute was changed." *Id.* ¶ 73. The court reasoned that even if the amendment is a procedural change rather than a substantive one, it should not be applied retroactively due to its retroactive impact. *Id.* ¶ 71.

¶ 33    We respectfully disagree with our colleagues in *Hunter* that *Hayashi* and *J.T. Einoder* clearly indicate the continued importance of a retroactive impact analysis where the legislature did not indicate a temporal reach for an amendment. In *Hayashi*, our supreme court noted the two-step *Landgraf* test it adopted in *Commonwealth Edison*, but in applying the first step found that the legislature had "plainly indicated the temporal reach" of the statutory enactment at issue. *Hayashi*, 2014 IL 116023, ¶¶ 23, 24. Therefore, it saw "no need" to consider section 4, which "controls by default only where the legislature has not clearly defined the temporal reach of a statute." *Id.* ¶ 24. In *Hayashi*, the court had no need to conduct a retroactive impact analysis or to resort to the "default" provision of section 4, nor did it discuss which one it would have applied had the legislature not indicated a temporal reach.

¶ 34    In *J.T. Einoder*, our supreme court again noted the two-step *Landgraf* test but acknowledged that in *Caveney*, it found that "Illinois courts will rarely, if ever, need to go beyond step one of the *Landgraf* analysis" in light of section 4. *J.T. Einoder*, 2015 IL 117193, ¶¶ 29-32. Regarding the case before it, the court found that the trial court improperly searched the entire statute for legislative intent on the amendment's temporal reach, when it should only have looked at the text of the amended provision itself. *Id.* ¶ 34. The court then reasoned that if no express intent is found, the amendment may be applied retroactively if "it is merely procedural in nature." *Id.* For the amendment at issue, the legislature did not indicate a temporal reach and our supreme court determined that the amendment was a substantive change in the law because it would impose a new liability on the defendant's past conduct. *Id.* ¶¶ 35, 36. Therefore, the court concluded that the amendment "cannot be applied retroactively." *Id.* ¶ 36. In *J.T. Einoder*, our supreme court did not find, nor did it have a need to address, whether an impact analysis remains an important consideration in determining the retroactive application of a procedural amendment.

¶ 35    We find neither *Hayashi* nor *J.T. Einoder* contradicts our supreme court's determination in *Caveney* that "with respect to a statutory amendment or repeal, it is virtually inconceivable that an Illinois court will ever go beyond step one of the *Landgraf* approach" because "the legislature *always* will have clearly indicated the temporal reach of an amended statute, either expressly in the new legislative enactment or by default in section 4 of the Statute on Statutes." (Emphasis in original.) *Caveney*, 207 Ill. 2d at 94. Section 4 allows the retroactive application

of amendments or repeals if the changes are procedural in nature, while substantive changes may not be retroactively applied. *Id.* at 92. Accordingly, we agree with *Patterson*'s conclusion that the amendment to section 5-130 is procedural in nature, and therefore, pursuant to *Caveney*, it may be applied retroactively.

¶ 36 Like the defendants in *Patterson* and *Hunter*, defendant here was 15 years old when he committed the offense, was convicted and sentenced in criminal court, and while his appeal was pending the legislature enacted the amendment to section 5-130, which raised the minimum age for automatic transfer to criminal court from 15 to 16 years old. Since the prior version of the statute was in effect during defendant's proceedings, the State did not file a petition for a transfer hearing. Following *Patterson*, we affirm defendant's conviction but remand the case to juvenile court and give the State an opportunity to file a petition for a transfer hearing if it so chooses. If a hearing is held and the court determines that defendant's case should be transferred to criminal court for sentencing, the sentencing court shall follow our reasoning above (and that of *Nieto*), in determining an appropriate sentence for defendant.

¶ 37 Due to our resolution of defendant's appeal, we need not consider defendant's remaining sentencing issue raised in his brief.

¶ 38 Defendant also contends that two of his convictions for first degree murder should be vacated pursuant to the one-act, one-crime rule. The State agrees with defendant that two of his first degree murder convictions should be vacated. Therefore, we order that the mittimus be corrected to reflect only one conviction for first degree murder.

¶ 39                                                                  CONCLUSION

¶ 40 For the foregoing reasons, defendant's sentence of 60 years' imprisonment is vacated, and the cause is remanded for resentencing. We also order the mittimus corrected to reflect only one conviction for first degree murder.

¶ 41 Sentence vacated and cause remanded; mittimus corrected.