# Illinois Official Reports

## Appellate Court

*People v. Perez*, 2018 IL App (1st) 153629

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRISTOPHER PEREZ, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-15-3629 |
| Filed<br>Rehearing denied | March 5, 2018<br>March 26, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-7756; the Hon. Michael B. McHale, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Drew A. Wallenstein, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Jon Walters, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Presiding Justice Pierce and Justice Mikva concurred in the judgment and opinion. |

**OPINION**

¶ 1 Defendant-appellant, Christopher Perez, was arrested by Chicago police on suspicion of first degree murder in the shooting death of Edgar Delgado. Defendant proceeded to trial where a jury convicted him of intentional first degree murder and personally discharging a firearm during the commission of the offense. Defendant filed a motion for entry of judgment of acquittal, which the trial court denied. The trial court sentenced defendant to 53 years in prison, which included the 25-year firearm enhancement.

¶ 2 Defendant raises several issues on appeal. Defendant argues (1) the State failed to prove him guilty of first degree murder beyond a reasonable doubt, (2) the State improperly impeached its own witness, (3) his 53-year sentence violates the eighth amendment to the federal constitution and the proportionate penalties clause of the Illinois Constitution, (4) this court should invoke its powers under Illinois Supreme Court Rule 615(b)(4) and reduce his sentence, (5) his mittimus should be corrected to reflect the correct amount of presentence credit, and (6) his mittimus should be corrected to reflect only one conviction for first degree murder under the one act, one crime rule.

¶ 3 After reviewing the record and relevant case law, we affirm defendant's conviction for intentional first degree murder. We affirm his 53-year sentence. We order defendant's mittimus be corrected to reflect only one conviction for intentional first degree murder and the proper amount of presentence credit.

¶ 4                                    JURISDICTION

¶ 5 On February 26, 2015, a jury found defendant guilty of intentional first degree murder in that he personally discharged a firearm causing the death of Delgado. On October 15, 2015, the trial court sentenced defendant to 53 years in prison. A notice of appeal was filed on the same day. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, § 6; Ill. S. Ct. Rs. 603, 606 (eff. Feb. 6, 2013).

¶ 6                                    BACKGROUND

¶ 7 Defendant-appellant, Christopher Perez, was charged with six counts of first degree murder stemming from the shooting death of Delgado, who was shot and killed on the streets of Chicago on February 18, 2012. Both defendant and the victim were 17 at the time of the murder. A jury trial was held wherein the State proceeded on two of the six murder counts. Both counts alleged that defendant discharged a firearm during the offense, making him eligible for the mandatory 25-year sentencing enhancement.

¶ 8 The State's first witness was Bernardino Mercado. Mercado testified that on February 18, 2012, he was walking near the intersection of Belmont Avenue and Monticello Avenue when his friend, David Cabrera, pulled up alongside and asked if he wanted a ride. Mercado entered Cabrera's car and the pair proceeded north on Monticello Avenue. They eventually parked on Monticello Avenue, and after being parked for about five minutes, Mercado noticed three cars. He thought they looked suspicious because the cars were driving bumper-to-bumper at about 10 to 15 miles per hour. The pair decided to follow in their vehicle. Traveling about 50 feet

behind, Mercado observed the lead car turn onto Roscoe Street. He then saw the second car hit someone on a bike. The bike rider flew into the air. At this point, Cabrera again parked the car on Monticello Avenue, this time south of the intersection with Roscoe Street. Mercado observed an individual exit the second vehicle and begin chasing someone. Mercado believed the individual being chased was the bike rider but admitted he could not be sure. The chase headed south on Monticello Avenue toward Mercado and Cabrera.

¶ 9        Mercado observed the individual who had exited the second car raise his hand and fire three gunshots in the direction of the individual fleeing south. Mercado testified he saw flames come out of the pursuer's hands. As both individuals moved closer to them, Mercado was able to identify both. The person fleeing ran under a streetlight some 5 to 10 feet from Mercado, and he observed that individual to be Delgado, whom he knew from school. Mercado observed Delgado trip and fall. As Delgado was on the ground, the pursuer also came into the streetlight's illumination and Mercado observed his face as well. Mercado testified that the pursuer was the defendant, Perez, whom he knew from the neighborhood. He observed the defendant's full face for what he claimed to be 30 seconds. He observed defendant with a silver handgun approach Delgado, fire one shot, and then flee back toward the intersection of Monticello Avenue and Roscoe Street. Defendant reentered the vehicle and left the scene.

¶ 10       Delgado got up and saw the pair. Mercado opened the back door of the vehicle and told Delgado to get in. Delgado told them he had been shot. Mercado and Cabrera drove Delgado to a hospital at the corner of Addison Street and Central Avenue. The pair obtained a nearby paramedic, who with the assistance of another paramedic, pulled Delgado from the car and took him into the hospital. Mercado and Cabrera then left the hospital because they did not want to be involved.

¶ 11       Mercado talked with the police about the incident on March 19, 2012. During this conversation, Mercado was presented with a group of photographs from which he identified the defendant as the shooter. Mercado then met with the police again on March 21, 2012. During this meeting, the officers asked him to view a lineup of several individuals. Mercado again identified defendant as the person who shot Delgado. Mercado gave a statement to an assistant state's attorney as well. The statement mirrored the testimony he provided in court and again identified defendant as the shooter. During his testimony, Mercado was also presented with a picture of the intersection of Monticello Avenue and Roscoe Street looking south down Monticello Avenue. From that picture, Mercado identified the streetlamp where the shooting proximately took place. He also identified the bike in the photograph as the one he saw the night of the shooting.

¶ 12       On cross-examination, Mercado admitted he could not recall the colors of the cars. He admitted that he never called 9-1-1 and did not tell anyone at the hospital he had witnessed a shooting. Mercado also explained that he talked with police on February 22, 2012, though he did not remember much of the conversation. When pressed by defense counsel about why he did not identify the defendant as the shooter on February 22, Mercado admitted he "didn't know why." Mercado further conceded he talked with Hector Martinez, who was with Delgado on the night of the shooting. He asked Martinez about who was on the bike the night of the shooting, and Martinez explained that it was him on the bike not the victim. Mercado admitted he saw an individual on a bike get hit by a car and then moments later saw the victim running toward him; because of this, he had assumed the victim had been the same person riding the

bike. When pressed again about why he did not identify defendant on February 22, Mercado explained that the police never asked him.

¶ 13    Martinez was the victim's cousin and was with him the night of the shooting. He admitted he was being held in contempt of court because he had failed to respond to the subpoena to testify in this case. On the night of February 18, 2012, he and the victim were walking toward the victim's father's house so that Delgado could eat and shower. Martinez rode his blue mountain bike while Delgado walked alongside of him. They were walking on Roscoe Street, and as they approached the intersection with Monticello Avenue, three cars pulled up on them. Martinez told Delgado to run, and Delgado began to run south on Monticello Avenue. Martinez then began riding his bike down Roscoe Street.[1]

¶ 14    As he was riding down Roscoe Street, Martinez was hit from behind by a minivan, causing him to fall to his knees. He then turned around to see the driver and the passenger of the van. He could not identify the driver but alleged that defendant was seated in the passenger seat. He recognized defendant because he had "seen him a couple of weeks ago before that." Martinez then began running down Roscoe Street. While he was running, he heard four or five gun shots. He turned his head to see four or five individuals standing at the corner of Roscoe Street and Monticello Avenue. They were all wearing black hooded sweatshirts with the hood up. He could not identify any of them nor did he see a gun. He then ran back to his home not far from the scene. He tried to call Delgado but received no answer. A Chicago police detective came to his door later that night. Martinez described this conversation as short, and he was unable to recall the specifics of what was discussed. He then accompanied the detectives back to area headquarters where a longer conversation took place. During this conversation, he identified the three cars he observed prior to the shooting. He told the detectives the first car was a green Blazer with a broken window, the second was the minivan that hit him, and the third car was a red two-door.

¶ 15    Martinez was interviewed again on February 23, 2012. He specifically denied seeing the defendant on the corner of Roscoe Street and Monticello Avenue when the shooting occurred. He denied telling the detectives he witnessed the defendant exit a vehicle. He also denied telling them that, as he was running from the scene, he observed the defendant on the corner with three to four other Hispanic males. He did admit that he identified defendant from a photo array.

¶ 16    On cross-examination, Martinez stated it was only a matter of seconds between him getting knocked off his bike and when the shooting started. He identified the Blazer as the car he saw people exiting from prior to the shooting. He also explained that the testimony he was giving was consistent with the statement he provided to the assistant state's attorney and the statement to the grand jury.

¶ 17    The State then called Cabrera, the driver who was with Mercado when the shooting happened. He confirmed many of the details of Mercado's testimony but admitted he never saw the shooter's face and could not identify him. He confirmed that while on Monticello Avenue, he saw a bike rider get hit by a car. He only saw one person exit from the middle car and that person fired at the victim. He admitted he did not stay at the hospital because he did not want to be involved.

_____

[1]Roscoe Street is an east-west street; however, the record is unclear which direction Martinez rode "down."

¶ 18    The State also called several police officers and the doctor who performed the autopsy of the victim. Dr. Goldschmidt confirmed that the victim died of two gunshots wounds to the back. He found no evidence of close range firing around either wound. He also found the entry and exit wounds were not at a significant angle from each other. Detective John Haniacek interviewed Martinez on February 23, 2012. The detective alleged that during this interview, Martinez did indentify defendant as one of the individuals on the corner immediately prior to the shooting. However, he admitted his reports do not state that Martinez identified defendant as the shooter.

¶ 19    At the close of the State's case, the defendant moved for a directed verdict, which the trial court denied. The defendant did not testify and did not call any additional witnesses. The jury then deliberated and found defendant guilty of the murder of Delgado and also that he personally discharged a firearm during the offense. Defendant filed a motion for entry of judgment of acquittal, which the trial court denied. After listening to the aggravating and mitigating factors, the trial court sentenced defendant to 53 years imprisonment.

¶ 20    Defendant timely filed his notice of appeal.

¶ 21                                    ANALYSIS

¶ 22    In his first issue, the defendant argues the State failed to prove him guilty of first degree murder beyond a reasonable doubt. Defendant attacks the testimony of Mercado as inconsistent, contradictory, and completely unreliable. Defendant asks this court to reverse his conviction given the unreliable nature of Mercado's testimony and the lack of physical evidence tying him to the murder.

¶ 23    When a defendant argues that the evidence was insufficient to sustain his conviction, the inquiry is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). In reviewing the sufficiency of the evidence, the appellate court will not retry the defendant. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). It is the trier of fact's function to assess witness credibility, weigh and resolve conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Williams*, 193 Ill. 2d 306, 338 (2000). While the trier of fact's findings regarding witness credibility are entitled to great weight, the determination is not conclusive. *Smith*, 185 Ill. 2d at 542. The fact that the factfinder accepted testimony as true does not guarantee that it was reasonable to do so. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). However, an appellate court will only reverse a conviction where no "rational tier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Smith*, 185 Ill. 2d at 541.

¶ 24    In raising this argument, defendant asks us to reject the testimony of Mercado as unreliable and, instead, accept the version testified to by Martinez. Our supreme court has stated that the testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). An individual's eyewitness testimony is insufficient "where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at 280. A reviewing court will reverse a conviction based on eyewitness testimony where that testimony is "improbable, unconvincing or contrary to human experience." (Internal quotation marks omitted.) *People v. Ortiz*, 196 Ill. 2d 236, 267 (2001).

¶ 25    After reviewing the testimony presented at trial, we do not find it unreasonable for the jury to rely on the testimony of Mercado. Defendant is correct that Mercado was impeached by omission (*People v. Williams*, 329 Ill. App. 3d 846, 854 (2002)) in that he did not initially identify the defendant as the shooter when first given an opportunity. However, impeachment is not evidence. *People v. Douglas*, 2011 IL App (1st) 093188, ¶ 47. Impeachment challenges the credibility of the witness, and the trier of fact will determine what weight to give it. *Id.* Mercado testified that he initially did not say anything because he did not want to get involved, the same reason given by Cabrera. When first approached by police, the police explained that people in the neighborhood were saying Mercado knew something. It would not be unreasonable for the jury to infer the reason neither Mercado nor Cabrera wanted to be involved was fear of retribution if they named the shooter.

¶ 26    Despite the defendant's insistence, we also do not find the jury's acceptance of Mercado's version of events over Martinez's to be unreasonable. Importantly, both Mercado and Martinez put the defendant at the scene of the crime. While Mercado did not initially identify the defendant, he did so at three subsequent occasions, all of which were under oath. Mercado identified defendant in a sworn statement to the assistant state's attorney, at the grand jury hearing, and then several times at trial. Each time Mercado stated that he saw Delgado run into the light of the streetlamp followed by defendant. He knew defendant from the neighborhood. He testified that he got a full face view of both the victim and defendant. While Cabrera testified he could not identify the shooter, he corroborated Mercado's testimony that there was only one shooter.

¶ 27    While defendant holds Martinez out as the more credible of the two witnesses, the photographs entered into evidence contradicted a key part of his testimony. Martinez testified that when they first noticed the cars, he told Delgado to run. Delgado took off south on Monticello Avenue, while he began to ride his bike "down" Roscoe Street. Yet, the photographs show Martinez's bike in the middle of the intersection of Roscoe Street and Monticello Avenue, not "down" Roscoe Street as he testified. The State also impeached Martinez with the testimony of Detective Haniacek. Detective Haniacek testified that Martinez told him the defendant was standing on the corner when the shooting took place. Thus, Martinez is not without his own credibility issues.

¶ 28    Defendant also argues Mercado's testimony was contradicted by the photographic and forensic evidence, specifically his observations concerning the distance from the streetlight to the intersection and distance between the shooter and victim. Notably, the record does not contain pictures either identifying where Cabrera's car was located or where Delgado was shot the second time. Moreover, any alleged discrepancy between Mercado's testimony and the photographic and forensic evidence was for the trier of fact to resolve. *Williams*, 193 Ill. 2d at 338 (finder of fact weighs and resolves conflicts in the evidence). We also reject defendant's attempt to utilize Google Maps to relitigate the issue on appeal. Neither the photographic nor forensic evidence rendered Mercado's testimony improbable or contrary to the human experience.

¶ 29    Defendant's reliance on *People v. Shaw*, 2015 IL App (1st) 123157, is misplaced. In *Shaw*, this court reversed a robbery conviction that had been based solely on the complaining witness's testimony. *Id.* ¶¶ 15, 30, 32. In reversing the conviction, this court found the sole witness's account of events was contradicted by both the surveillance video and police testimony. *Id.* ¶ 26 (surveillance video seriously calls into questions witness's encounter with

defendant). These impeachments rendered the testimony incredible and, therefore, unreliable. *Id.*

¶ 30    We do not find Mercado's testimony improbable or contrary to the human experience. Both Mercado and Martinez placed defendant at the scene of the crime. While Mercado did not identify defendant as the shooter initially, he did identify him three subsequent times, including at trial. Martinez testified defendant was present in the minivan but not on the corner where the shots were fired. It was therefore up to the trier of fact to resolve the inconsistencies in their testimony and come to a conclusion. Given all the other testimony and evidence produced at trial, we do not find the jury's conclusion to believe the testimony of Mercado to be unreasonable.

¶ 31    Defendant next contends the State improperly impeached Martinez without showing he had affirmatively damaged its case. He testified at trial he only saw defendant in the minivan. Martinez denied defendant could have been on the corner of Monticello Avenue and Roscoe Street when the shooting happened. During his testimony, the State impeached his trial testimony by examining him regarding certain prior inconsistent statements related to defendant's location at the scene. The State also presented the evidence of Detective Haniacek, who relayed Martinez's prior inconsistent statements.

¶ 32    "The credibility of a witness may be attacked by any party, including the party calling the witness." Ill. S. Ct. R. 238(a) (eff. Apr. 11, 2001). A prior inconsistent statement can be admitted for impeachment purposes only if the trial testimony of the witness does "affirmative damage" to the calling party's case. *People v. Cruz*, 162 Ill. 2d 314, 361 (1994) (citing *People v. Bradford*, 106 Ill. 2d 492, 500 (1985)). "It is only when the witness' testimony is more damaging than his complete failure to testify would have been that impeachment is useful." *People v. Sims*, 285 Ill. App. 3d 598, 610 (1996) (citing *People v. Weaver*, 92 Ill. 2d 545, 563-64 (1982)). Affirmatively damaging testimony is testimony that is not merely disappointing but that gives "positive aid" to the other side. *People v. Johnson*, 2013 IL App (1st) 111317, ¶ 47.

¶ 33    After reviewing the testimony of Martinez, we conclude the State properly impeached him. In arguing that the State improperly impeached Martinez, defendant states "at no point did Martinez ever identify the shooter or ever claim to know the guilt or innocence of Perez." We disagree with this contention. The State's theory of the case was that defendant shot Delgado, first while chasing him south down Monticello Avenue, and then again under a street lamp further south on Monticello Avenue. This was based on the testimony of Mercado. Martinez testified that defendant hit him with a minivan, and then seconds later, he observed a group of individuals shooting south down Monticello Avenue. He testified there would have been no time for defendant to hit him with the van and then make it to the corner to shoot at Delgado. Accordingly, Martinez's testimony was that defendant could not and did not shoot Delgado. The testimony that defendant could not have been the shooter completely contradicts the State's argument that defendant was the shooter. Therefore, the testimony of Martinez was affirmatively damaging to the State's case, and the State could impeach him with his prior inconsistent statement that defendant was on the corner when the shooting happened.

¶ 34    Defendant also challenges the imposition of the 53-year sentence. Defendant argues that his 53-year sentence constitutes a *de facto* life sentence, shocks the conscience in light of his individual circumstance, and was imposed without consideration of his youth in violation of

the eighth amendment to the federal constitution and the proportionate penalties clause of this state's constitution.

¶ 35    After being found guilty, defendant faced a sentencing range of 45 years to life, which included the 25-year mandatory firearm enhancement. During the trial, the court heard evidence the victim was walking to his father's house with his cousin when defendant surprised them at the corner of Monticello Avenue and Roscoe Street. The victim, unarmed, then fled south on Monticello Avenue as defendant fired at him from the corner. After the victim fell, the defendant approached him and fired again into the victim's back. The medical examiner confirmed the victim had been shot twice in the back. The State, noting the heinous nature of the crime, asked the court to sentence defendant to more than the minimum 45 years. Defense counsel asked for the minimum.

¶ 36    In *People v. Reyes*, 2016 IL 119271, ¶ 9, the Illinois Supreme Court held that a *de facto* life sentence imposed on a juvenile "constitutes cruel and unusual punishment in violation of the eighth amendment" if such a sentence is imposed without considering the mitigating factors set forth in *Miller v. Alabama*, 567 U.S. 460 (2012). In *Reyes*, the State conceded that the defendant-juvenile would not live long enough to become eligible for release. *Reyes*, 2016 IL 119271, ¶ 10 (defendant would be eligible for release after serving 89 years). Even though the sentence was not for a term of natural life, the court determined the length of the sentence amounted to a "*de facto* [life sentence]" and therefore *Miller* had to be considered before its imposition. *Id.* The *Reyes* court did not specifically address what constitutes a *de facto* life sentence, so that remains an open question under Illinois law.

¶ 37    Defendant argues that his sentence is a *de facto* life sentence because he will be unlikely to survive prison. He will be 70 upon release. In his brief before this court, defendant cites to several actuarial tables to demonstrate he will not survive to release. These tables are based on defendant's ethnicity. While acknowledging life in prison can be harsh, we decline to speculate about defendant's likely lifespan. We are in no position to do so. It is troubling that defendant seeks to rely on arguments based around his ethnicity. Appellate courts will be treading into dangerous territory if they start reviewing sentencing reductions through the prism of race, ethnicity, or gender. As this court previously observed:

> "Is it simply a certain age upon release? If so, is it age 65, as defendant seems to argue for in his appellate brief, or 90? Should the age vary by ethnicity, race or gender? If we are going to consider more than age, what societal factors or health concerns should impact our assessment of a *de facto* life sentence. These are policy considerations that are better handled in a different forum." *People v. Jackson*, 2016 IL App (1st) 143025, ¶ 57.

We agree with *Jackson* that courts are not the forum for such a debate, and we categorically reject defendant's attempt to utilize ethnicity based life-expectancy tables as grounds for a sentence reduction.

¶ 38    Defendant was 17 years old when this crime was committed and he faced a minimum sentence of 45 years to a maximum of life after a jury found him guilty of killing the victim with two bullets to the back. The trial court sentenced him to 53 years, which included the mandatory 25-year enhancement for using a firearm. After serving his entire sentence, the 70 year old defendant will be released, which offers "hope for some years of life outside prison walls." *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 737 (2016). Defendant's

sentence is survivable and cannot be considered a *de facto* life sentence. Therefore, the *Miller* factors did not need to be considered and the sentence does not violate the eighth amendment.

¶ 39    We recognize that there is disagreement as to what exactly constitutes a *de facto* life sentence for a juvenile. While defendant's sentence is long, it is not as long as the majority of sentences Illinois courts have determined to be *de facto* life sentences. See *Reyes*, 2016 IL 119271 (97-year sentence); *People v. Morris*, 2017 IL App (1st) 141117, ¶ 30 (100-year sentence); *People v. Sanders*, 2016 IL App (1st) 121732-B, ¶¶ 25-27 (100-year sentence); *People v. Nieto*, 2016 IL App (1st) 121604, ¶ 42 (78-year sentence); *People v. Decatur*, 2015 IL App (1st) 130231, ¶ 18 (105-year sentence). But see *People v. Buffer*, 2017 IL App (1st) 142931, ¶ 64 (50-year sentence equates to a *de facto* life sentence), *appeal allowed*, No. 122327 (Ill. Nov. 22, 2017); *People v. Ortiz*, 2016 IL App (1st) 133294, ¶ 24 (60-year sentence equates to a *de facto* life sentence). Unlike this case, in the majority cited above, nobody disputed those sentences were not survivable.

¶ 40    Defendant also argues that his sentence violates the proportionate penalties clause of the Illinois Constitution. He contends that his 53-year sentence for shooting an unarmed juvenile in the back as the victim fled in terror "shocks the moral sense of the community." Article I, section 11, of the Illinois Constitution is commonly referred to as the "proportionate penalties clause." Ill. Const. 1970, art. I, § 11. It contains two limitations on criminal penalties: "(1) penalties must be determined 'according to the seriousness of the offense' and, (2) penalties must be determined 'with the objective of restoring the offender to useful citizenship.' " *People v. Clemons*, 2012 IL 107821, ¶ 37 (quoting Ill. Const. 1970, art. I, § 11). Under this provision of our constitution, a sentence may be deemed "unconstitutionally disproportionate if *** the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002) (*Leon Miller*).

¶ 41    Important to our considerations here, the Illinois Supreme Court has expressly stated, "there is no indication [in our constitution] that the possibility of rehabilitating an offender was to be given greater weight and consideration than the seriousness of the offense in determining a proper penalty." *People v. Taylor*, 102 Ill. 2d 201, 206 (1984). In considering the seriousness of the offense, a court should look at the degree of harm, the frequency of the crime, and the risk of bodily injury associated with it. *People v. Hill*, 199 Ill. 2d 440, 454 (2002).

¶ 42    Gun violence is a plague on the city of Chicago and this state. Due to its pervasiveness, the General Assembly passed the firearm enhancement statute requiring the imposition of additional prison time for the use of a firearm during the commission of certain crimes. 730 ILCS 5/5-8-1(a)(1)(d)(i)-(iii) (West 2000). The General Assembly recently enacted a new statute to allow a trial court discretion in imposing the enhancement on juveniles. 730 ILCS 5/5-4.5-105(b) (West 2016). However, the General Assembly did not eliminate the enhancement's application completely. In still allowing its application, it obviously feels some situations involving minors will warrant the enhancement. It also did not make the provision retroactive. *People v. Hunter*, 2017 IL 121306, ¶ 56 (not yet released for publication and subject to withdrawal). This indicates that the General Assembly continues to believe the use of a firearm during the commission of certain felonies represents an act worthy of additional punishment, even if a defendant is a juvenile.

¶ 43    With the above in mind, we first look at the facts upon which defendant's conviction is based. Mercado testified that minutes before the shooting he observed three cars driving

slowly and close together. Mercado found this "suspicious" and decided to follow. Mercado believed these vehicles were about to commit a crime, and he wanted to observe it. The actions of the vehicles demonstrate the murder was not a product of "rash decision making." *Leon Miller*, 202 Ill. 2d at 341; *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 73. Martinez's testimony also reveals that, upon seeing the three vehicles, both he and the victim immediately recognized the gravity of the situation and took flight. Defendant exited the vehicle he occupied and fired at the victim as he fled. After the victim fell, either because he tripped or had just had a bullet enter his back, defendant approached and fired another round into the victim's back. This crime is shocking and disturbing.

¶ 44        Defendant's conduct is not the sole consideration when analyzing a sentence under the proportionate penalties clause. Defendant's personal characteristics must also be considered. *Gipson*, 2015 IL App (1st) 122451, ¶ 72 (citing *Leon Miller*, 202 Ill. 2d at 340-42). In arguing his personal characteristics render the sentence unconstitutional, defendant focuses on the fact he was 17 when the crime was committed. Defendant also claims he was negatively affected by gang life and peer pressure. Defendant attempts to analogize his characteristics to those of the defendants in *Gipson* and *Leon Miller*. In *Gipson* the record contained evidence that defendant, a juvenile, had mental illness that made him prone to impulsive behavior. *Id.* ¶ 73. Defendant's own counsel described defendant as a " 'disturbed retarded child' under his older brother's spell." *Id.* ¶ 17. He had previously been found unfit to stand trial in a prior proceeding and even the trial court recognized the state system failed defendant by not providing mental health treatment. *Id.* ¶ 74. The record in this case does not contain remotely similar findings regarding our defendant's mental health or personal history.

¶ 45        *Leon Miller* is also factually distinguishable. Unlike the facts of this case, Leon Miller was convicted under a theory of accountability and he had only been informed of the shooting about a minute before it occurred. *Leon Miller*, 202 Ill. 2d at 341. As the *Leon Miller* court expressly stated, "this case concerns the sentence of a juvenile convicted under a theory of *accountability*." (Emphasis in original.) *Id.* at 342. These two facts render any comparison between our case and *Leon Miler* inappropriate.

¶ 46        Defendant committed an extremely heinous crime when he shot and killed Delgado, and we find nothing in the record concerning defendant's personal characteristics would render his sentence unconstitutional under the proportionate penalties clause.

¶ 47        In his third argument seeking a sentence reduction, defendant asks this court to utilize its power under Illinois Supreme Court Rule 615(b)(4). This rule allows the court to "reduce the punishment imposed by the trial court." Ill. S. Ct. R. 615(b)(4). We decline defendant's invitation to reduce his sentence based on this rule because his argument simply rehashes arguments he made that his sentence violated the eighth amendment to the federal constitution and the proportionate penalties clause of the Illinois Constitution. Moreover, the new sentencing guidelines were not made retroactive, and we decline to apply them retroactively. See *Hunter*, 2017 IL 121306, ¶ 56 (holding that the new sentencing guidelines do not apply retroactively). Defendant's sentence violates neither the federal nor state constitutions, and we affirm its imposition.

¶ 48        Finally, defendant contends we must order a correction to his mittimus. Defendant's mittimus shows convictions for both the lesser included crime of knowing first degree murder and intentional first degree murder. The State concedes, pursuant to *People v. Alvarez-Garcia*, 395 Ill. App. 3d 719, 734 (2009), the conviction for the lesser included offense should merge

into the greater offense. We agree and order defendant's mittimus corrected to reflect solely a conviction for intentional first degree murder.

¶ 49 Defendant further contends he is entitled to additional presentence credit. The State agrees defendant is entitled to 1283 days of credit, not the 919 days currently stated on defendant's mittimus. Accordingly, we order defendant's mittimus corrected to reflect a total presentence credit of 1283 days.

¶ 50 CONCLUSION

¶ 51 For the foregoing reasons, we affirm defendant's conviction for intentional first degree murder. We affirm his 53-year sentence. We order two corrections to defendant's mittimus. First, his mittimus should reflect only one conviction for intentional first degree murder. Defendant is also entitled to 1283 days of presentence credit.

¶ 52 Affirmed; mittimus corrected.