2017 IL App (1st) 141117

SECOND DIVISION
March 28, 2017
Modified on Denial of Rehearing May 2, 2017

No. 1-14-1117

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | 10 CR 17983 |
| | ) | |
| PHAROAH MORRIS, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE PIERCE delivered the judgment of the court, with opinion.
Presiding Justice Hyman and Justice Neville concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Pharoah Morris, who was 16 years old at the time of the offense, was convicted of first degree murder, attempted murder, and aggravated battery with a firearm following a jury trial. He was sentenced to an aggregate sentence of 100 years in prison. Defendant appeals, arguing that (1) he received a *de facto* life sentence without meaningful consideration of mitigating circumstances, (2) the applicable sentencing statutes that mandate firearm enhancements are facially unconstitutional under the Federal and Illinois Constitutions, and under the Illinois Constitution as applied to him, (3) section 5-130(1) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5-130(1) (West Supp. 2015)), which automatically transfers 16-year-olds charged with murder and attempted murder to adult court, therefore subjecting them to mandatory adult sentencing, violates the Federal and Illinois Constitutions and due process, and (4) he is entitled to a new sentencing hearing under the newly enacted section 5-4.5-105 of

the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105(a), (b) (West Supp. 2015)), which requires trial courts to consider certain factors before sentencing and gives trial courts discretion to impose firearm enhancements for individuals under 18. For the reasons that follow, we remand for resentencing.

¶ 2                                    BACKGROUND

¶ 3      On September 8, 2010, Pharaoh Morris fatally shot DeAntonio Goss and attempted to kill Corey Thompson. Defendant was charged with first degree murder, attempted murder, and aggravated battery with a firearm.

¶ 4      Prior to trial, the State filed two motions to admit proof of other crimes. According to the first motion, Marvin Floyd was shot in the back on August 21, 2010, while riding his bicycle near a gas station. Defendant was identified as the offender. Subsequent testing of the .45-caliber bullet recovered from Floyd's body and the .45-caliber bullet recovered from Goss's body revealed that both bullets were fired from the same gun. The State's motion sought admission of this evidence to show identity and absence of mistake.

¶ 5      The second motion stated that while at the Cook County jail, defendant discussed his pending murder case with his cellmate, Ricky Whitehead. Defendant approached Whitehead with a list of the witnesses in his pending case, each name listed with their respective address and date of birth, and asked Whitehead if he could "take care of them." Understanding this to mean defendant wanted them killed, Whitehead gave the list to Sheriff Investigator McCoy. The investigator assigned an officer to act as a hitman and introduced both he and defendant over a taped phone call. Defendant asked that the undercover officer come to the jail. Once at the jail, the officer recorded his conversations with defendant, who gave him a list of names and asked that he "get rid of them." The State sought to admit this evidence of the solicitation to show

defendant's consciousness of guilt.

¶ 6    The trial court held that the evidence of the shooting of Floyd and the evidence of the ballistics match admissible as proof of identity. The court also held admissible the solicitation of murder evidence to prove consciousness of guilt.

¶ 7    At trial, Marvin Floyd testified that on the date he was shot, August 23, 2010, he had known defendant for about three years. Floyd testified that on the afternoon of August 23, 2010, he was riding his bike to the gas station near his home when he saw defendant at the gas station. He testified that he saw a gun under defendant's pants and tried to flee on his bike, but was shot in the back. He stated he was taken to the hospital where he stayed for two months and underwent two surgeries.

¶ 8    Corey Thompson testified that on September 8, 2010, after attending class at Bowen High School, he was walking home with his friends, among them DeAntonio Goss. At some point, Thompson and Goss reached the street corner of 86th Street and Saginaw Avenue and saw that defendant and his friend, Lacy Sheppard, were also there. Defendant began speaking to Thompson and Goss and said, "This is what y'all want, this is what y'all going to get," and pulled out a gun and pointed it at Thompson. Thompson testified that he began running back toward school while noticing Goss running in a different direction. Thompson stated that as he was running he heard gunshots and then suddenly felt something hit him in his buttocks. Thompson stated he felt pain and fell down, but then got up to keep running before beginning to feel drowsy, weak, and unable to run anymore. He testified he lay down in the middle of the street, heard Goss say, "CJ, where are you, where are you, are you okay?" and then observed Defendant head towards Goss's voice. Thompson testified he then heard a few more gunshots before passing out. Thompson was taken to the hospital where he stayed for three weeks and

3

underwent two surgeries.

¶ 9    Ricky Whitehead testified that he was defendant's cellmate at the Cook County department of corrections. He stated that while there, defendant gave him a list of the names of witnesses in defendant's pending trial and asked if he could "take care of them." Whitehead testified he understood this to mean defendant wanted them killed, and subsequently gave the list to Investigator McCoy.

¶ 10    Eric Bucio testified that he is an instructor at the Cook County jail complex. He stated that on August 9, 2012, he was assigned to investigate defendant. He testified that he recovered a list of witness names from defendant's personal items.

¶ 11    Hilary McElligott, an assistant medical examiner for Cook County, testified that she examined Goss's body. The bullet that caused his death entered the back of his right arm, exited on the other side of the arm, and entered his body again on the right side of his chest.

¶ 12    Patrick Brennan, a supervisor with the Illinois State Police Forensic Science Center testified that the bullet recovered from Floyd's body, the bullet recovered from Goss, and a cartridge case that was found at the scene of the shooting were fired from the same firearm.

¶ 13    The State rested. Defendant did not present any evidence.

¶ 14    After hearing all of the evidence, the jury found defendant guilty of the first degree murder of Goss, the attempted murder of Thompson, and the aggravated battery with a firearm of Thompson.

¶ 15    At the sentencing hearing, the defense argued in mitigation that defendant was a juvenile with a troubled background, a history of mental illness and drug and alcohol abuse, and that he had rehabilitative potential. Defense counsel explained that defendant's father had been incarcerated for much of defendant's life. Defense counsel explained that at the age of 12,

defendant began seeing a psychiatrist to address his anger management and was ultimately diagnosed with bipolar disorder for which he received medication. Moreover, counsel pointed out that defendant attempted suicide at the ages of 15, 17, and 18. Finally, defense counsel elicited the fact that defendant began drinking alcohol at the age of 11, followed shortly thereafter with marijuana use, and that by the age of 13 he was drinking 20 glasses of hard alcohol and smoking five "blunts" of marijuana every day. Defense counsel asked the trial court for the minimum sentence in consideration of these mitigating factors contained in defendant's presentence investigation (PSI) report.

¶ 16    In allocution, defendant told the court that he did not shoot Thompson, stating that Sheppard did. The record then shows the trial court made the following statements. "I've read the PSI dated March 31st, I've considered the fact that defendant did not have the best upbringing, it doesn't justify murder, however. I'll consider it for what it was worth." The court went on to say, "The other factors in aggravation and mitigation, I've considered all of them. What's mitigating about Pharaoh Morris? Not much. At the time of the murder, 16 years old, that's about all that's mitigating." In regards to rehabilitation, the court stated:

> "Is there room for rehabilitation for Pharaoh Morris? That's up to him. If he's rehabilitated he'll be inside, however. Pharaoh Morris has shown by his conduct two weeks before the incident, the murder of DeAntonio Goss, on the day of the incident ***, which was September 8, 2010, and even thereafter in the jail, I want these people [*sic*] tooken care of *** I like to read the cases, I find little words in each one of them. I think I found ones that apply to Pharaoh Morris. Pharaoh Morris has a malignant heart ***. It applies to Pharaoh Morris, it was written for him. A young guy out on the streets of the City of Chicago with a gun, shooting it up, hitting one guy two weeks before, two guys

5

on the date of the murder, including the murder victim obviously and then I want these people [*sic*] tooken care of. Everybody in the world knows what that means, [*sic*] tooken care of.

There's some times, Pharaoh, you commit a crime you pretty much forfeit your right to be ever out on the street again, this is one of them. Everything I give you in a few seconds, Mr. Morris, you earned every single day, every single minute, every single second. Maybe you can live a useful life in prison, however, not back on the streets of the City of Chicago."

¶ 17    The trial court sentenced defendant to consecutive terms of 55 years for the first degree murder and 45 years for the attempted first degree murder, for a total of 100 years in prison.

¶ 18                                    ANALYSIS

¶ 19    Defendant argues that his sentence of 100 years' imprisonment is a *de facto* life sentence and is the result of an unconstitutional sentencing scheme in violation of *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455 (2012), as the trial court was precluded from considering his youthful characteristics. He also contends that the applicable sentencing statutes, which mandate consecutive prison terms (730 ILCS 5/5-8-4(d)(1) (West 2010)) and 25-year and 20-year firearm enhancements (730 ILCS 5/5-8-1(a)(1)(d)(iii), 5-8-4(c)(1)(C) (West 2010)) violate the eighth amendment (U.S. Const., amend. VIII) and the proportionate penalties clause (Ill. Const. 1970, art. I, § 11), both facially and as applied to him. He argues that the automatic transfer provision which automatically transfers 15- and 16-year-olds charged with first degree murder and aggravated battery with a firearm to adult court (705 ILCS 405/5-130(1)(a) (West 2010)), thereby subjecting them to mandatory adult sentencing statutes, violates the eighth amendment, the proportionate penalties clause, and due process. Finally, he argues that he is entitled to a new

sentencing hearing under the newly enacted section 5-4.5-105 of the Code (730 ILCS 5/5-4.5-105(a), (b) (West Supp. 2015)), which requires the trial court to consider certain factors before sentencing and gives trial courts discretion to impose firearm enhancements for individuals under 18.

¶ 20    Defendant, who was 16 years old at the time he committed the offenses in this case, was sentenced to 100 years' imprisonment in aggregate for his convictions of first degree murder, attempted murder, and aggravated battery with a firearm. The statutory minimum for first degree murder was 45 years: 20 years for the murder and 25 years for the firearm enhancement. The statutory minimum for the attempted first degree murder was 26 years: 6 years for the underlying Class X felony and 20 years for the firearm enhancement. In total, the minimum prison term the trial court was required to impose was 71 years. The maximum it could impose was natural life: 20 to 60 years for first degree murder plus 25 years to natural life for the firearm enhancement, and 6 to 30 years for the underlying Class X felony plus 20 years for the firearm enhancement. Defendant will have to serve 100% of the 55-year sentence and at least 85% of the 45-year sentence, meaning he will serve at least 93 years and 4 months.

¶ 21    The Supreme Court held in *Miller* that the eighth amendment to the United States Constitution "forbids a sentencing scheme that mandates life in prison without the possibility of parole for juvenile offenders." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469. The Court emphasized that in fashioning an appropriate sentence, recognition of youth is the most important consideration. *Id.* at ___, 132 S. Ct. at 2465-66. Therefore, criminal procedure laws that fail to adequately account for the offender's youthfulness are flawed. *Id.* at ___, 132 S. Ct. at 2466. The Court explained that children, through both common sense and with the aid of social sciences, are constitutionally different from adults for purposes of sentencing. *Id.* at ___, 132 S. Ct. at

2464. Juveniles have diminished culpability and a greater prospect for reform, and therefore "they are less deserving of the most severe punishments" (internal quotation marks omitted) (*id.* at \_\_\_, 132 S. Ct. at 2464), which, according to *Graham v. Florida*, 560 U.S. 48, 68 (2010), includes life without parole. The Court went on to say:

> "First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. [Citation.] Second, children are more vulnerable . . . to negative influences and outside pressures, including from their family and peers; they have limited contro[l] over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. [Citation.] And third, a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievabl[e] deprav[ity]." (Internal quotation marks omitted.) *Id.* at \_\_\_, 132 S. Ct. at 2464.

¶ 22 The Court further emphasized the distinctive attributes of youth by emphasizing two main rationales behind sentencing: retribution and rehabilitation. *Id.* at \_\_\_, 132 S. Ct. at 2465. First, the Court stated that such youthful attributes diminish the justifications of imposing the harshest sentences on juveniles, even when they commit terrible crimes, because the retribution rationale is rooted in the offender's blameworthiness, which is not as strong with children as with adults. *Id.* at \_\_\_, 132 S. Ct. at 2465. Second, by sentencing a juvenile to life without parole, the court is making a determination that the offender is simply unable to change and will forever be a menace to society. *Id.* at \_\_\_, 132 S. Ct. at 2465. But life without parole "forswears altogether the rehabilitative ideal," and reflects "an irrevocable judgment about [an offender's] value and place in society," which is at odds with a child's capacity for change. (Internal quotation marks omitted.) *Id.* at \_\_\_, 132 S. Ct. at 2465. Only the worst of youth, those that are deemed

"permanently incorrigible," should be considered for life without parole. *Id.* at ___, 132 S. Ct. at 2469. Mandatory punishment, the Court said, precludes consideration of youth's "hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences." *Id.* at ___, 132 S. Ct. at 2468. "It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional." *Id.* at ___, 132 S. Ct. at 2468.The Court elaborated on *Miller* in *Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718 (2016). The Court reiterated *Miller*'s central holding that life sentences without parole for juvenile offenders pose too great a risk of disproportionate punishment. *Id.* at ___, 136 S. Ct. at 733. *Miller* requires the trial judge to account for how children are different before irrevocably sentencing them to life in prison, and the Court stressed that such an occasion will be uncommon. *Id.* at ___, 136 S. Ct. at 733. *Montgomery* pointed out, however, that even if a court considers a child's age before sentencing him to life without parole, it still violates the eighth amendment if the crime committed reflects the child's "unfortunate yet transient immaturity." (Internal quotation marks omitted.) *Id.* at ___, 136 S. Ct. at 734. Therefore, *Montgomery* held that *Miller* established a substantive rule: all juveniles must have an opportunity to prove they fall within a class of defendants that, because of their status as youths and their attendant circumstances, makes a sentence of life without parole unconstitutional. *Id.* at ___, 136 S. Ct. at 734. It follows that those sentenced to a life without parole must be afforded an opportunity to show they are capable of change. *Id.* at ___, 136 S. Ct. at 736.

¶ 23    Subsequently, while this appeal was pending, our supreme court issued its most recent opinion addressing the *Miller* holding in *People v. Reyes*, 2016 IL 119271. In *Reyes*, the court extended the holding of *Miller* to apply to sentencing schemes that mandate an aggregate term-

of-years which result in a *de facto* life sentence for juvenile offenders. *Id.* ¶ 9. The court found:

> "A mandatory term-of-years sentence that cannot be served in one lifetime has the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole—in either situation, the juvenile will die in prison. *Miller* makes clear that a juvenile may not be sentenced to a mandatory, unsurvivable prison term without first considering in mitigation his youth, immaturity, and potential for rehabilitation." *Id.*

The court held that "sentencing a juvenile offender to a mandatory term of years that is the functional equivalent of life without the possibility of parole constitutes cruel and unusual punishment in violation of the eighth amendment." *Id*. In order for a court to impose a lengthy sentence, judicial discretion must be applied. *Id*.

¶ 24    Since *Montgomery* and *Reyes*, this court has extended relief to juvenile defendants where the record affirmatively showed that the trial court failed to consider such factors before imposing a *discretionary* sentence of natural life without the possibility of parole in *People v. Nieto*, 2016 IL App (1st) 121604, and *People v. Ortiz*, 2016 IL App (1st) 133294.

¶ 25    In *Nieto*, 2016 IL App (1st) 121604, this court determined that under *Montgomery*, *Miller*'s prohibition against mandatory life sentences without parole for juveniles also applies to discretionary life sentences without parole. Nieto was convicted of first degree murder and aggravated battery with a firearm. *Id.* ¶ 4. Though the defendant's statutory minimum sentence was 51 years, the trial court chose to sentence defendant to 78 years, 75.3 of which he would be required to serve. *Id.* ¶¶ 12-13. The *Nieto* court recognized that *Montgomery* did not distinguish mandatory life sentences without parole from discretionary *de facto* life sentences, and took this to mean that the trial court must consider a juvenile's special characteristics even when

exercising discretion. *Id.* ¶¶ 46, 49. "After *Montgomery*, *Miller* requires that a juvenile be given an opportunity to demonstrate that he belongs to the large population of juveniles not subject to natural life in prison without parole, even where his life sentence resulted from the trial court's exercise of discretion." *Id.* ¶ 47.

¶ 26    We concluded that because the defendant would not be released from prison until he is 94 years old, he effectively received a natural life sentence without parole. *Id.* ¶ 42. Although the trial court did consider the defendant's young age when imposing sentence, we nonetheless vacated the defendant's sentence because the trial court did not consider the corresponding characteristics of the defendant's youth. *Id.* ¶ 56.

¶ 27    In *People v. Ortiz*, 2016 IL App (1st) 133294, the defendant committed first degree murder at age 15 and was sentenced to 60 years' imprisonment, and would be required to serve 100% of his sentence. *Id.* ¶ 24. The record showed that at the sentencing hearing, the trial court recognized defendant had a "difficult upbringing" and that his parents "allowed" him to quit school and associate himself freely with the Latin King gang. (Internal quotation marks omitted.) *Id*. However, the trial court placed more emphasis on defendant's lack of remorse, continued violence while incarcerated, and knowledge of wrongdoing, and told defendant that he must be held accountable and pay the price by being incarcerated.

¶ 28    We determined that since the defendant would not be eligible for release until the age of 75 years old, he effectively received a life sentence without parole and adopted *Nieto*'s analysis to hold that "for a juvenile's mandatory or discretionary sentence of life in prison without parole to be constitutionally valid, the sentencing judge must take into consideration his youth and attendant characteristics to determine whether the defendant is the rarest of juvenile offenders *** whose crimes reflect permanent incorrigibility," or whether his crimes reflect "unfortunate

yet transient immaturity." (Internal quotation marks omitted.) *Id.* ¶¶ 19, 23. In vacating the defendant's sentence, we noted that while the trial court did consider defendant's young age and his personal history, it did not consider the corresponding characteristics of his youth as outlined in *Miller* and *Montgomery* or their effect on his conduct. *Id.* ¶ 25.

¶ 29    We also found support for our holding from the legislature's recent enactment of section 5-4.5-105 of the Code (Pub. Act 99-69 (eff. Jan. 1, 2016)), which provides that for all defendants who commit crimes under the age of 18 on or after January 1, 2016, the court must consider various attendant-youth characteristics before sentencing. 730 ILCS 5/5-4.5-105(a)(1)-(a)(3) (West Supp. 2015); *Ortiz*, 2016 IL App (1st) 133294, ¶ 23. The characteristics to be considered include impetuosity, level of maturity, the ability to consider risks and consequences, whether they were subjected to outside pressures, their home environment, and any history of parental neglect, physical abuse, or other childhood trauma. 730 ILCS 5/5-4.5-105(a)(1)-(a)(3) (West Supp. 2015); *Ortiz*, 2016 IL App (1st) 133294, ¶ 23.

¶ 30    Here, the juvenile defendant's statutorily mandated minimum sentence was 71 years for his crimes. The trial court instead sentenced defendant to 55 years in prison for first degree murder and 45 years in prison for the attempted murder, both to be served consecutively for an aggregate of 100 years' imprisonment. Defendant is required to serve 93.25 years of this sentence, meaning the earliest he is eligible for release will be at the age of 109 years. Using the rationale in *Nieto* and *Ortiz*, we find that defendant has received the functional equivalent of an effective life sentence without parole. This *de facto* life sentence is improper because the trial court did not meaningfully consider defendant's youth and attendant characteristics, as well as their effect on him, as outlined in *Miller* and *Montgomery*, before sentencing him.

¶ 31    The record reveals that defendant had a troubled background, a history of mental illness,

and a history of drug and alcohol abuse. Defendant's PSI report showed defendant's father was incarcerated in Wisconsin; that, at the age of 12, defendant began seeing a psychiatrist to address anger management, for which he was diagnosed with bipolar disorder and received medication; and that defendant attempted suicide at the ages of 15, 17, and 18. The PSI report also indicated that at the age of 11, defendant began drinking alcohol and, shortly thereafter, began using marijuana. By the age of 13, defendant was drinking multiple glasses of hard alcohol a day and smoking multiple "blunts" of marijuana.

¶ 32    Looking at the record in its entirety, we are not convinced that the trial court adequately considered defendant's youth and attendant circumstances before sentencing him to an effective life sentence which, following *Miller*, is reserved only after the rare finding of permanent incorrigibility. Although the trial court commented on defendant's youth and upbringing ("What's mitigating about Pharoah Morris? Not much. At the time of the murder, 16 years old, that's about all that's mitigating") and acknowledged that it read defendant's PSI ("I've read the PSI dated March 31st, I've considered the fact that Defendant did not have the best upbringing") we do not find these observations to be the equivalent to a full consideration of those special characteristics contained within the PSI report. The trial court weighed heavily on defendant's prior conduct. We do not doubt the trial court when it said, "I've been doing this, December was 25 years. I can't recall a case as horrible as this one. Shoot one guy, weeks later shoot two guys, kill one and try and get the witnesses killed so you get a chance to go home." However, the trial court did not weigh heavily defendant's opportunity for rehabilitation: "Is there room for rehabilitation for Pharoah Morris? That's up to him. If he's rehabilitated he'll be inside, however." It went on to say, "There's some times, Pharoah, you commit a crime you pretty much forfeit your right to be ever out on the street again, this is one of them *** . Maybe you can live a

useful life in prison, however, not back on the streets of the City of Chicago." It is not apparent from the record that the trial court carefully considered defendant's youthful characteristics against those aggravating factors before coming to the ultimate conclusion that defendant is "the rarest of juvenile offenders *** whose crimes reflect permanent incorrigibility," rather than a reflection of his "unfortunate yet transient immaturity." (Internal quotation marks omitted.) *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734.

¶ 33    By sentencing defendant to 100 years in prison, the trial court made the ultimate decision that defendant, at the age of 16, was permanently incapable of change. Included in this sentence were mandatory sentencing enhancements of 45 years. And the trial court believed that this sentence will "deter[ ] others from hopefully doing the same." However, pursuant to *Montgomery*, deterrence is diminished in juvenile sentencing because juveniles' recklessness, immaturity, and impetuosity make them less likely to consider possible punishment. *Id.* at ___, 136 S. Ct. at 726. The trial court stated, "Pharoah Morris has a malignant heart. I like that phrase, a malignant heart. It applies to Pharoah Morris, it was written for him." *Miller* did not foreclose a severe sentence for a juvenile "whose crime reflects irreparable corruption" and the Court noted that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Id.* at ___, 132 S. Ct. at 2469. Whether this is such an uncommon case will be determined at a resentencing hearing conducted in accordance with the ruling in this case. Accordingly, we vacate defendant's unconstitutional sentence and remand for resentencing.

¶ 34    Because the defendant will have the benefit of a new sentencing hearing we need to address whether he will be sentenced under the provisions of Public Act 99-69. (Pub. Act 99-69, § 10 (eff. Jan 1, 2016) (adding 730 ILCS 5/5-4.5-105)) and Public Act 99-258 (Pub. Act 99-258, § 5 (eff. Jan. 1, 2016) (amending 705 ILCS 405/5-130, 5-805)). While defendant's case was

pending on direct appeal, the legislature passed Pub. Act 99-69 (eff. Jan. 1, 2016) (adding 730 ILCS 5/5-4.5-105). Section 5-4.5-105 of the Code now requires the sentencing judge to consider multiple youthful mitigation factors and gives the judge the discretion to decline imposition of the aggregate 45 years of mandatory firearm enhancements that were imposed as part of defendants 100 year sentence. The parties were granted leave to file supplemental briefs on the issue of the applicability of the newly enacted section 5-4.5-105 of the Code at resentencing.

¶ 35    In his supplemental brief, defendant contends that his case must be remanded for resentencing under the new sentencing provisions contained in section 5-4.5-105 of the Code. In its supplemental brief, the State argues that section 5-4.5-105 of the Code does not apply retroactively because the plain language of section 5-4.5-105 of the Code clearly indicates the legislature intended prospective application only.

¶ 36    Section 5-4.5-105 of the Code provides

"(a) On or after the effective date of this amendatory Act of the 99th General Assembly, when a person commits an offense and the person is under 18 years of age at the time of the commission of the offense, the court, at the sentencing hearing conducted under Section 5-4-1, shall consider the following additional factors in mitigation in determining the appropriate sentence:

(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social

15

background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105 (West Supp. 2015).

Additionally, sections 5-4.5-105(b) and 5-4.5-105(c) of the Code provide that, except in cases where the offender has been convicted of certain homicide offenses that are inapplicable here, the trial court "may, in its discretion, decline to impose any otherwise applicable sentencing enhancement based upon firearm possession." 730 ILCS 5/5-4.5-105(b), (c) (West Supp. 2015).

¶ 37   Subsequently, our supreme court decided *People v. Reyes*, 2016 IL 119271. In *Reyes,* the defendant was 16 years of age at the time of the offense. Our supreme court vacated defendant's *de facto* life sentence as "unconstitutional pursuant to *Miller*." *Id*. Ordering a resentencing hearing, the *Reyes* court agreed with both the defendant and the State that the resentencing

hearing would be subject to the provisions of section 5-4.5-105. *Id*. ¶ 14. The court noted that because section 4 of the Statute on Statues (5 ILCS 70/4 (West 2014)) entitles a defendant "to be sentenced under either the law in effect at the time the offense was committed or that in effect at the time of sentencing," the proper remedy was to remand for resentencing under section 5-4.5-105(b) of the Code. The court further agreed with both the defendant and the State that "by applying this new sentencing scheme, the circuit court will have the discretion *not* to apply the firearm sentencing enhancements and, without these enhancements, the mandatory minimum aggregate sentence to which defendant would be subject is 32 years, a term that is not a *de facto* life sentence." (Emphasis in original.) *Reyes*, 2016 IL 119271, ¶ 12. The court remanded to the trial court with directions that a new sentencing hearing be held in accordance with section 5-4.5-105 "because defendant would not be subject to a mandatory, life-without-parole sentence under section 5-4.5-105." *Id*. Following *Reyes*, we remand for resentencing under section 5-4.5-105 of the Code. Accordingly, the circuit court will have the discretion to apply or decline to apply the mandatory firearm sentencing enhancements applicable in this case.

¶ 38    Because we have ordered a resentencing hearing in accordance with section 5-4.5-105 of the Code, we need not consider defendant's argument that the 20-year and 25-year firearm enhancements violate the federal and Illinois constitutions, and the proportionate penalties clause of the Illinois Constitution as applied to defendant because they did not permit the trial court to consider his young age at the time of the offense.

¶ 39    We emphasize that we are not critical of the trial court's observations made at sentencing after it had the benefit of hearing the evidence of the defendant's conduct and the circumstances giving rise to his conviction. Our decision should not be taken as any indication of our position as to the appropriate sentence, and this decision should not to be interpreted as a limitation on the

discretion given to the sentencing judge when imposing the sentence it deems appropriate after consideration all of the sentencing factors discussed previously.

¶ 40    Finally, defendant argues that the version of section 5-130(1)(a) of the Act, which was in effect at the time he committed the offenses, which automatically transfers 15- and 16-year-olds charged with murder and attempted murder to adult court violates the eight amendment, the proportionate penalties clause of the Illinois Constitution and federal and state due process rights.

¶ 41    Defendant recognizes that our supreme court upheld the constitutionality of the Illinois automatic transfer provision under the eighth amendment and due process clauses of the federal constitutional and the proportionate penalties clause of the Illinois Constitution in *People v. Patterson*, 2014 IL 115102. He argues however, that *Patterson* was incorrectly decided on the question of whether automatic transfer to adult court is punishment within the meaning of federal and state constitutional prohibitions on cruel and unusual punishment.

¶ 42    We find no reason to depart from the holding in *Patterson*. "As an intermediate appellate court, we are bound to honor our supreme court's conclusion on this issue unless and until that conclusion is revisited by our supreme court or overruled by the United States Supreme Court." *People v. Fountain*, 2012 IL App (3d) 090558, ¶ 23.

¶ 43                                CONCLUSION

¶ 44    We hold that defendant was given a *de facto* life sentence without meaningful consideration of his youth and attendant characteristics, as well as their effect on him. Accordingly, the cause is remanded to the circuit court for resentencing in accordance with section 5-4.5-105 of the Code (730 ILCS 5/5-4.5-105 (West Supp. 2015)).

¶ 45    Remanded for resentencing.