2021 IL App (4th) 190151

NO. 4-19-0151

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 10, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| WILLIE CHAMBERS, | ) | No. 14CF791 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Scott D. Drazewski, |
| | ) | Judge Presiding. |

---

JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Justices Holder White and Steigmann concurred in the judgment and opinion.

**OPINION**

¶ 1        The defendant, Willie Chambers, is serving a sentence of 42 years' imprisonment for first degree murder, an offense to which he pleaded guilty. See 720 ILCS 5/9-1(a)(2) (West 2014). After an unsuccessful direct appeal (*People v. Chambers*, 2018 IL App (4th) 160232-U, *appeal denied*, No. 123591 (Ill. Sept. 26, 2018)), he petitioned for postconviction relief. The circuit court of McLean County summarily dismissed the *pro se* petition. See 725 ILCS 5/122-2.1(a)(2) (West 2018). Chambers appeals. In our *de novo* review (see *People v. Tate*, 2012 IL 112214, ¶ 10), we are unable to say that the *pro se* petition is "based on an indisputably meritless legal theory or a fanciful factual allegation" (*People v. Hodges*, 234 Ill. 2d 1, 16 (2009)). Therefore, we reverse the judgment and remand this case for further proceedings.

¶ 2                                I. BACKGROUND

¶ 3                            A. The Guilty Plea Hearing

¶ 4                                    1. *The Plea Agreement*

¶ 5        Chambers was charged, in the present case, with the first degree murder of Ronald Smith (720 ILCS 5/9-1(a)(1), (2) (West 2014)). Additionally, in other cases, he was charged with robbery, aggravated battery, and mob action, and he faced the prospect of having his probation revoked that he had received for residential burglary.

¶ 6        Chambers made a deal with the State. He would plead guilty to count II of the information, a strong-probability theory of first degree murder (*id.* § 9-1(a)(2)): specifically that, on June 2, 2014, "without lawful justification, [he] struck Ronald Smith on and about the body, knowing such act created a strong probability of great bodily harm to Ronald Smith, thereby causing the death of Ronald Smith." Also, Chambers would testify truthfully against his codefendants, Tory Washington and Anthony Davis-Dixon. In return, the State would dismiss the remaining charges against Chambers and would dismiss the petitions to revoke his probation. For count II, Chambers would be subject to the normal sentencing range of "not less than 20 years and not more than 60 years," the standard penalty for first degree murder. 730 ILCS 5/5-4.5-20(a)(1) (West 2014). The State would not seek a greater, extended term sentence on the theory that "the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." *Id.* § 5-5-3.2(b)(2).

¶ 7                                    2. *The Factual Basis*

¶ 8        On August 7, 2015, in the guilty plea hearing, the circuit court asked the prosecutor if he had a factual basis for the proposed guilty plea. See Ill. S. Ct. R. 402(c) (eff. July 1, 2012) (providing that "[t]he court shall not enter final judgment on a plea of guilty without first determining that there is a factual basis for the plea"). The prosecutor proposed beginning the

factual basis by having Chambers testify pursuant to his promise of cooperation. Accordingly, Chambers took the stand and described to the court what happened on June 2, 2014.

¶ 9 By Chambers's account, he and some friends of his were in a park in Bloomington, Illinois. They were skateboarding, drinking hard liquor, swallowing Xanax pills (an anti-anxiety medication), and playing a game called "point them out, knock them out."

¶ 10 The first target of the game was Kyle Fairchild. Chambers punched Fairchild once, either in the face or on the back of the head. Chambers's three companions—Washington, Davis-Dixon, and someone named "JT"—likewise punched Fairchild. After receiving this beating, Fairchild left the park. Chambers and his friends returned to a jungle gym and drank more alcohol and took more pills.

¶ 11 Then they saw "the homeless guy," Ronald Smith, as he was lying down under a tree near a fence. Davis-Dixon suggested, " 'Let's go beat him up.' " This time it was just three of them who went over: Chambers, Washington, and Davis-Dixon. (It is unclear where JT was at this point.) Chambers was the one who hit Smith first. He punched Smith in the face, and Smith began yelling. Then Washington hit Smith. Throughout this beating, Smith was lying on the ground, hollering. Then Davis-Dixon jumped in the air and landed on Smith's rib cage, and Smith became silent. The three of them left Smith where he lay, and they returned to the pavilion and resumed drinking. Eventually, Smith got off the ground and began walking away. Washington and Davis-Dixon returned to Smith and punched him "a couple of times more." After delivering those parting punches, Washington and Davis-Dixon fled. Chambers fled too—but not before he picked up some Goldfish Crackers that Smith had dropped and apologized to him.

¶ 12          Next, Chambers and three others—Davis-Dixon, JT, and someone named Isaiah— set out on foot toward Normal, Illinois. They entered Kroger, a supermarket in Normal, where Davis-Dixon stole some liquor. After getting kicked out of Kroger, they drank the stolen liquor.

¶ 13          Drinking and walking, they passed by a hospital, where they saw another man whom they decided to beat up. Davis-Dixon and Washington (who reappears at this point in Chambers's narrative) pounded on this man until he was on the ground, bleeding. Then they ran.

¶ 14          Eventually, they slowed to a walk and saw another man. Chambers's companions urged him, " 'It's your turn.' " Chambers punched this man four or five times. Then Chambers and the others walked away.

¶ 15          Near the public library in Normal, they saw a man wearing headphones. Davis-Dixon and Washington beat him up. When the man fell to the ground, they took his headphones.

¶ 16          The group started walking again. The police came onto the scene and stopped them. The last victim, the man near the library, had called in the robbery. After finding the stolen blue headphones in Washington's pocket, the police arrested him, Chambers, and the others.

¶ 17          The prosecutor supplemented the foregoing factual basis by informing the circuit court that on June 2, 2014, the homeless man, Smith, went to BroMenn Hospital to obtain treatment for his injuries. Smith remained in the hospital until July 3, 2014, when he died. An autopsy revealed that Smith had died from an infection secondary to the internal injuries that Chambers, Washington, and Davis-Dixon had inflicted upon him. The shoes that Chambers was wearing at the time of his arrest were spattered with Smith's blood, as DNA testing confirmed.

¶ 18                          B. The Sentencing Hearing

¶ 19                    1. *The Presentence Investigation Report*

### a. Previous Adjudications

The presentence investigation report listed juvenile adjudications for theft, retail theft, resisting arrest, and domestic battery.

### b. Prior Conviction

Chambers had a prior conviction of residential burglary. The date of that offense was August 6, 2013. Chambers was born on April 29, 1996, so he was 17 when he committed the residential burglary, for which he received probation. For that matter, he already was on juvenile probation when he committed the residential burglary.

### c. Family History

Chambers's father was shot and killed when Chambers was one year old. When Chambers was two years old, he was removed from his mother's custody because of her substance abuse and was placed in foster care, where he remained for 2½ years. His foster parents physically abused him and locked him in closets. The month of his fifth birthday, Chambers was returned to his mother's custody. A few years later, his mother married his stepfather. When Chambers was eight, his mother and his stepfather were convicted of unlawful delivery of a controlled substance. The mother received probation. The stepfather was sentenced to imprisonment. Upon being released from prison, the stepfather returned to the home and battered the mother.

### d. Personal Difficulties

From early childhood, Chambers suffered from learning disabilities and mental-health problems. He was psychiatrically hospitalized at least seven times. On at least two occasions, he tried to hang himself. Psychiatric hospitalization and other intensive residential treatment greatly improved his behavior. Upon returning, however, to his mother's dysfunctional home, he soon began misbehaving again.

¶ 28                                    2. *Evidence in Aggravation*

¶ 29        For evidence in aggravation, the prosecutor presented written statements by Smith's son and brother, both of whom called for the severest punishment authorized by law. The prosecutor likewise recommended the maximum sentence of 60 years' imprisonment.

¶ 30                                    3. *Evidence in Mitigation*

¶ 31        For evidence in mitigation, defense counsel presented some 55 pages of records pertaining to Chambers's diagnosed clinical disorders and his social and cognitive deficits. Among those records was a 2007 psychoeducational evaluation, which concluded that Chambers had "a general level of intellectual ability" within the low average range: specifically, a general ability index "somewhere within the range of 75 and 87," which put him in "the 11th percentile." (In the guilty plea hearing, Chambers had told the circuit court that he was unable to read or write.) Acknowledging the seriousness of the offense but highlighting the hardships and disadvantages to which Chambers had been subjected his entire life, defense counsel recommended a sentence of 30 years' imprisonment.

¶ 32                                    4. *The Statement in Allocution*

¶ 33        Chambers made the following statement in allocution:

"I'm sorry for what happened to the man that died. I did not mean to kill him. I keep—I keep thinking about that night. I be telling myself 'You are not that kind of person,' but much of the time I be helping a lot of people. I be drinking—I have been drinking that night. But I'm not going to put drinking for what I did. I cannot live with myself doing what I did. I please hope that your family can forgive me for what I did. So please can you forgive me so I can move on with my life[?] A man is dead because of me. And I know that—I know there's something, anything I can

do, so even much—even makes it right. But I hope someday that gets the chance to go back in the world and at least try to make up for what I did."

¶ 34          5. *The Circuit Court's Rationale for 42 Years' Imprisonment*

¶ 35          After the concluding arguments by counsel and the statement in allocution, the circuit court enumerated what it had taken into account in deciding on a sentence, including "the presentence investigation report," the defense exhibits, and "the factors in aggravation and mitigation."

¶ 36          One of the mitigating factors in the circuit court's analysis was that Chambers's "criminal conduct [had been] induced or facilitated by some others besides himself." See 730 ILCS 5/5-5-3.1(a)(5) (West 2014). Also, it seemed to the court, there was "at *** least some evidence" that the murder was "a result of circumstances that [were] unlikely to re-occur." See *id.* § 5-5-3.1(a)(8). For a further factor in mitigation, the court found Chambers to be intellectually disabled. See *id.* § 5-5-3.1(a)(13).

¶ 37          On the other hand, the circuit court considered, in aggravation, that Chambers "ha[d] a history of prior delinquency or criminal activity." See *id.* § 5-5-3.2(a)(3). Also, "a sentence [was] necessary to deter others from committing the same crime." See *id.* § 5-5-3.2(a)(7). It was yet another aggravating factor that Chambers "was on a term of probation during the commission of this offense." See *id.* § 5-5-3.2(a)(12).

¶ 38          After reciting those factors in mitigation and aggravation, the circuit court noted the following principles that should guide the determination of a sentence:

          "The [c]ourt, in imposing a sentence, must also balance a defendant's rehabilitative potential with the seriousness of the offense, and each sentencing decision must be based on the particular circumstances of the case. And the [c]ourt

must consider factors such as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age."

¶ 39 Apropos moral character, the circuit court was shocked by the unfeeling blood sport in which Chambers and his codefendants had avidly engaged over and over again. The court remarked:

"It didn't just result in the tragic death of Mr. Smith. It also resulted in other law-abiding citizens being hurt. And so the defendant, along with his [codefendants], were like a pack of wolves preying on innocent victims.

*** [A]s far as what transpired, yes, I'm offended. I'm shocked, in essence, by the game. And that's what it was, a game of 'Point them out, knock them out.' That's cruel. It's a callous disregard for the rights and safety of law-abiding citizens within this community. And all I can think of was it was similar to the events or occurrences that are depicted in the movie A Clockwork Orange."

¶ 40 The circuit court decided that, on balance, a fitting sentence would be imprisonment for 42 years (and restitution to the surviving victims). The court imposed this prison term with the explicit awareness that 100% of it would have to be served. See *id.* § 3-6-3(a)(2)(i).

¶ 41                                    C. The Postconviction Proceeding

¶ 42 On January 22, 2019, Chambers filed a *pro se* petition for postconviction relief, in which he raised two claims.

¶ 43 The first claim, which we already had rejected on direct appeal (*Chambers*, 2018 IL App (4th) 160232-U), was an asserted violation of *People v. Krankel*, 102 Ill. 2d 181, 189 (1984) (requiring the circuit court, in posttrial proceedings, to conduct a preliminary investigation of factual matters underlying the defendant's *pro se* claim of ineffective assistance of counsel, to

determine whether new counsel should be appointed to litigate the claim). In this appeal from the summary dismissal of his postconviction petition, Chambers does not pursue the *Krankel* claim.

¶ 44      The second claim in the *pro se* petition invoked *Miller v. Alabama*, 567 U.S. 460 (2012). It is this claim that Chambers pursues in the present appeal. He pleaded in his petition that the 42-year prison term was a *de facto* life sentence triggering the protections and special considerations that *Miller* required for "juvenile offenders," as Chambers referred to himself—although, in a footnote in his petition, he admitted that he was "just over a month past his 18th birthday at the time of the commission of the offense."

¶ 45      On February 7, 2019, for essentially four reasons, the circuit court summarily dismissed the postconviction petition. First, the court disagreed that 42 years' imprisonment was a *de facto* life sentence. Chambers had misread a longevity table, the court explained. Second, according to the United States Supreme Court's holding in *Miller*, 567 U.S. at 479, "the Eighth Amendment forb[ade] a sentencing scheme that *mandate[d]* life in prison without possibility of parole for juvenile offenders." (Emphasis added.) No such sentencing scheme was involved in the present case. Instead of being mandatory, the sentence of 42 years' imprisonment was discretionary. The sentence was one that the court had chosen on the basis of all the evidence presented in the sentencing hearing, including the presentence investigation report and the defense exhibits. Third, contrary to his self-characterization, Chambers was not a juvenile when he committed the offense. Rather, he was 18 years old, the age that the law had denominated as the beginning of adulthood. Fourth, the court explicitly considered Chambers's age (and a host of other factors) when determining the sentence.

¶ 46                                    II. ANALYSIS

¶ 47                              A. The Flagship Case, *Miller*

- 9 -

¶ 48    In *Miller*, 567 U.S. at 465, the two 14-year-old defendants were convicted of murder and were sentenced to life imprisonment without the possibility of parole. Statutory law gave the sentencing authorities no choice but to impose those punishments. "State law mandated that each juvenile die in prison even if a judge or jury would have thought that his youth and its attendant characteristics, along with the nature of his crime, made a lesser sentence (for example, life *with* the possibility of parole) more appropriate." (Emphasis in original.) *Id.*

¶ 49    Because "[t]he concept of proportionality [was] central to the [e]ighth [a]mendment" (internal quotation marks omitted) (*id.* at 469), a sentencing statute that "mandate[d] life in prison without possibility of parole for juvenile offenders" violated the eighth amendment (*id.* at 479). The statutory sentencing schemes at issue in *Miller* made youth and its transient features (*id.* at 476)—the incomplete neurological development with the resultant recklessness, impulsivity, impressionability, and malleability of youth (*id.* at 471-72)—completely "irrelevant to imposition of that harshest prison sentence" (*id.* at 479). The categorical approach of these sentencing statutes "pose[d] too great a risk of disproportionate punishment." *Id.*

¶ 50    This was not to say that it was constitutionally forbidden, no matter what the facts, to sentence a juvenile offender to life imprisonment for murder. *Id.* at 480; see also *People v. Lusby*, 2020 IL 124046, ¶ 1 (upholding, against a *Miller* challenge, a 130-year prison term imposed upon a defendant for a first degree murder and other offenses that he committed when he was 16). It was just that, before imposing such a severe sentence on a juvenile offender, the "sentencer [had to] have the ability to consider the mitigating qualities of youth." (Internal quotation marks omitted.) *Miller*, 567 U.S. at 476. The sentencer had to consider—and, thus, had to be statutorily allowed to consider—"the nature of their crimes" as well as the juvenile's "age and age-related characteristics." *Id.* at 489.

¶ 51        B. Interpretations and Applications of *Miller* by Our Own Supreme Court

¶ 52                        1. *Discretionary Life Sentences*

¶ 53        *Miller*, our own supreme court has concluded, applies not only to mandatory life sentences imposed on juvenile offenders but also to discretionary life sentences imposed on juvenile offenders. *People v. Holman*, 2017 IL 120655, ¶ 40. "Life sentences, whether mandatory or discretionary, for juvenile defendants are disproportionate and violate the eighth amendment, unless the trial court considers youth and its attendant characteristics." *Id.*

¶ 54                        2. *De Facto Life Sentences*

¶ 55        In *People v. Reyes*, 2016 IL 119271, ¶ 9, the supreme court held that "[a] mandatory term-of-years sentence that [could not] be served in one lifetime ha[d] the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole," triggering *Miller*'s protections. The defendant in *Reyes*, who was 16 years old at the time of his offenses (*id.* ¶ 1), was sentenced to "a mandatory minimum aggregate sentence of 97 years' imprisonment" (*id.* ¶ 2).

¶ 56        Despite the designation of a number of years of imprisonment, the defendant in *Reyes* was sentenced, essentially, to die in prison. That was clear. It was highly unlikely that he would live 97 more years. But what if the prison term, instead of being 97 years, had been 50 years or 40 years or 30 years? How are we to know "when a prison sentence for a term of years imposed on a juvenile defendant is the functional equivalent of life without parole"? See *People v. Buffer*, 2019 IL 122327, ¶ 29. "[W]hen [is] a juvenile defendant's prison term *** long enough to be considered a *de facto* life sentence without parole"? See *id.* Our supreme court "cho[se] to draw the line at 40 years." *Id.* ¶ 40.

¶ 57    Here is why. In section 5-4.5-105(c) of the Unified Code of Corrections (730 ILCS 5/5-4.5-105(c) (West 2018)), "the General Assembly *** determined that the specified first degree murders that would justify natural life imprisonment for adult offenders would warrant a mandatory minimum sentence of 40 years for juvenile offenders." *Buffer*, 2019 IL 122327, ¶ 39. Evidently, then, in the belief of the legislature, "this 40-year floor for juvenile offenders who commit[ted] egregious crimes complie[d] with the requirements of *Miller*." *Id.* Deferring to that belief, the supreme court "conclude[d] that a prison sentence of 40 years or less imposed on a juvenile offender [did] not constitute a *de facto* life sentence in violation of the eighth amendment." *Id.* ¶ 41. But a prison sentence "greater than 40 years," imposed on a juvenile defendant, should be considered "a *de facto* life sentence." *Id.* ¶ 42.

¶ 58              3. *The Retroactive Applicability of* Miller

¶ 59    *Miller* applies retroactively to cases on collateral review. *People v. Davis*, 2014 IL 115595, ¶¶ 39, 42; see also *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 736 (2016) (holding likewise). In other words, a defendant may petition for postconviction relief on the basis of *Miller* even though *Miller* did not exist yet when the defendant was sentenced.

¶ 60    4. *What, Specifically, a Sentencing Court Must Consider Under* Miller

¶ 61    Some courts had "read *Miller* narrowly, holding that trial courts [had to] consider generally mitigating circumstances related to a juvenile defendant's youth"—in other words, just youthfulness in general. *Holman*, 2017 IL 120655, ¶ 42. Other courts had "read *Miller* more broadly, holding that trial courts [had to] consider specifically the characteristics mentioned by the Supreme Court." *Id.* ¶ 43. Since "age [was] not just a chronological fact but a multifaceted set of attributes that carr[ied] constitutional significance," *Holman* adopted the broad approach. *Id.* ¶ 44.

¶ 62    The Illinois General Assembly has adopted the broad approach too. Section 5-4.5-105(a) of the Unified Code of Corrections, effective January 1, 2016, provides as follows:

"(a) On or after the effective date of this amendatory Act of the 99th General Assembly, when a person commits an offense and the person is under 18 years of age at the time of the commission of the offense, the court, at the sentencing hearing conducted under Section 5-4-1 [(730 ILCS 5/5-4-1 (West 2018))], shall consider the following additional factors in mitigation in determining the appropriate sentence:

(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105(a) (West 2018).

Most of those factors come from *Miller*, 567 U.S. at 477-78.

¶ 63 It is arguable that, if *Miller* indirectly applied to a young adult offender's proportionate penalties claim (see *People v. Harris*, 2018 IL 121932, ¶ 45), the *Miller* factors would be applicable too. See *People v. Ruiz*, 2020 IL App (1st) 163145, ¶ 52.

¶ 64 5. *What a Juvenile Offender Must Show to Prevail Under* Miller

¶ 65 Our supreme court requires the following showing from a defendant seeking relief under the *Miller* line of cases:

"[T]o prevail on a claim based on *Miller* and its progeny, a defendant sentenced for an offense committed while a juvenile must show that (1) the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence." *Buffer*, 2019 IL 122327, ¶ 27.

Thus, noncompliance with *Miller* is never presumed. It must be shown. See *id.*

¶ 66 6. Miller *and a Proportionate Penalties Claim by a Young Adult Offender*

¶ 67        In *Harris*, 2018 IL 121932, ¶ 1, the defendant was convicted of first degree murder

and other violent offenses and was "sentenced to a mandatory minimum aggregate term of 76

years' imprisonment." When he committed the offenses, the defendant was 18 years and 3 months

old (*id.*)—just past his eighteenth birthday, like Chambers. On direct appeal, the young-adult

offender in *Harris* challenged his mandatory minimum aggregate sentence of 76 years'

imprisonment, contending that this punishment violated the eighth amendment to the United States

Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois

Constitution (Ill. Const. 1970, art. I, § 11). *Harris*, 2018 IL 121932, ¶ 17. The appellate court

rejected the eighth-amendment claim but held that the aggregate prison term offended the

"rehabilitation clause" of article I, section 11, which required that penalties "be determined with

' "the objective of restoring the offender to useful citizenship." ' " *Id.* ¶ 18 (quoting *People v.*

*Harris*, 2016 IL App (1st) 141744, ¶ 40, quoting Ill. Const. 1970, art. I, § 11). While recognizing

the seriousness of the defendant's crimes, the appellate court deemed it to be " 'shock[ing] [to] the

moral sense of the community to send this young adult to prison for the remainder of his life, with

no chance to rehabilitate himself into a useful member of society.' " *Id.* (quoting *Harris*, 2016 IL

App (1st) 141744, ¶ 69).

¶ 68        After granting the State's petition for leave to appeal as a matter of right (*id.* ¶ 20

(citing Ill. S. Ct. R. 317 (eff. July 1, 2006))), the supreme court agreed with the appellate court that

the defendant, being 18 years old at the time of his offenses, had no viable eighth-amendment

claim under *Miller* (*id.* ¶ 61). For purposes of the eighth amendment, the supreme court declined

to "extend[ ] *Miller* to offenders 18 years of age or older." *Id.*

¶ 69        The supreme court left the door open, however, to a claim under the proportionate

penalties clause of the Illinois Constitution, a clause providing that "[a]ll penalties shall be

determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship" (Ill. Const. 1970, art. I, § 11). See *Harris*, 2018 IL 121932, ¶ 48. The appellate court had gone ahead and granted the defendant relief under the proportionate penalties clause, remanding the case for resentencing. *Id.* ¶ 18. But the appellate court's decision on the proportionate penalties claim was, the supreme court concluded, premature because in the proceedings below no evidence had been adduced on that claim. *Id.* ¶ 46.

¶ 70    This conclusion by the supreme court—that review of the proportionate penalties claim was premature—presupposed that, theoretically, the claim had potential: that there was a legally cognizable claim that, perhaps, could be developed with evidence. The defendant's claim under the proportionate penalties clause was that (1) the juvenile brain development discussion in *Miller* applied to him as a young adult (*id.* ¶ 42) and, (2) given his asserted neurological immaturity at the time he committed the offenses, the 76-year prison sentence was shocking to the moral sense of the community (*id.* ¶ 36). The majority of the supreme court characterized this claim as an as-applied constitutional challenge to the sentencing statutes mandating the aggregate prison term of 76 years. *Id.* ¶ 37. The claim was that, given the defendant's "specific facts and circumstances," namely, his own alleged developmental immaturity at the time he committed the offenses, the sentencing statutes—which removed any discretion to impose a shorter aggregate prison sentence—were unconstitutional as applied to him (but the defendant did not go so far as to claim that the sentencing statutes were "unconstitutional under any possible set of facts," as in a facial challenge). *Id.* ¶ 38.

¶ 71    The trouble was that this as-applied claim rested on no evidence, at least none specific to the defendant and his crime. Because the defendant never raised his as-applied claim in the circuit court, no evidentiary hearing had been held on the claim. *Id.* ¶ 40. Consequently, there

were no "specific facts and circumstances" to review. *Id.* ¶ 38. If the defendant had been a *juvenile* when he committed his offenses, no further evidence would have been necessary: it would have been as simple as applying *Miller.* See *id.* ¶ 44. Because the defendant in *Harris* was 18, however, when he committed his offenses, he was an adult, and "*Miller* [did] not apply directly to his circumstances." *Id.* ¶ 45. Therefore, "[t]he record [had to] be developed sufficiently to address [the] defendant's claim that *Miller* applie[d] to his particular circumstances." *Id.*

¶ 72        Thus, it could not be taken for granted that the developmental immaturity rationale in *Miller*, applicable to juveniles, could be applied to this particular young adult in the particular circumstances of his offense. After the milestone of age 18, the applicability of *Miller* had to be shown by evidence. The supreme court did not specify what form the evidence should take. The supreme court merely decided that, in the record before it, more evidence was needed. In "the factual vacuum created by the absence of an evidentiary hearing and findings of fact by the trial court," a reviewing court lacked the means to make an as-applied finding of unconstitutionality. (Internal quotation marks omitted.) *Id.* ¶ 41. The record lacked "evidence about how the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision applie[d] to [the] defendant's specific facts and circumstances. Accordingly, [the] defendant's as-applied challenge [was] premature." *Id.* ¶ 46.

¶ 73        The defendant still had the option, however, of bringing his as-applied claim in postconviction proceedings, which "often require[d] presentation of evidence not contained in the record." *Id.* ¶ 48.

¶ 74                     C. What All This Means for the Present Case

¶ 75        It should be evident by now that not all of the circuit court's rationale for the summary dismissal of Chambers's *pro se* petition has stood up to subsequent developments in case

law. For one thing, the circuit court rejected Chambers's assertion that 42 years' imprisonment was a *de facto* life sentence. As we have discussed, however, *Buffer* held that a prison term longer than 40 years was a *de facto* life sentence for a juvenile offender convicted of first degree murder. *Buffer*, 2019 IL 122327, ¶ 42. By logical corollary, then, a prison term longer than 40 years would be a *de facto* life sentence for an adult offender convicted of first degree murder, since an adult is temporally closer to death than a juvenile. Also, the circuit court held *Miller* to be inapplicable to discretionary sentences. *Holman* subsequently concluded otherwise. See *Holman*, 2017 IL 120655, ¶ 40.

¶ 76        The circuit court was correct, though, that *Miller* was inapplicable to defendants who were 18 years of age or older at the time of their offense. See *Harris*, 2018 IL 121932, ¶ 61. More precisely, *Miller* was not *directly* applicable to them. Although young adult offenders had no eighth-amendment claim under *Miller*, *Harris* gave young adult offenders such as Chambers an indirect opening. The supreme court held in *Harris* that in a postconviction proceeding an 18-year-old offender could use the juvenile brain development rationale in *Miller* to claim that a 76-year prison sentence violated the proportionate penalties clause of the Illinois Constitution (*Harris*, 2018 IL 121932, ¶ 48; Ill. Const. 1970, art. I, § 11)—which, the supreme court previously had held, afforded greater protection than the eighth amendment (*People v. Clemons*, 2012 IL 107821, ¶ 40).

¶ 77        The State observes that this indirect application of *Miller* to an 18-year-old individual's commission of a particular offense is far from automatic and self-evident. The *pro se* petition for postconviction relief, the State argues, must have documentation attached to it corroborating that "the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision applies to [the] defendant's specific facts and circumstances."

- 18 -

*Harris*, 2018 IL 121932, ¶ 46; see 725 ILCS 5/122-2 (West 2018) (providing that "[t]he petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached"). Chambers attached no such documentation to his *pro se* petition, nor did his petition offer any explanation for the omission. See 725 ILCS 5/122-2 (West 2018). A *pro se* petition may be summarily dismissed for the lack of such supporting documentation. *People v. Delton*, 227 Ill. 2d 247, 255 (2008).

¶ 78 Even if the lack of corroborating documentation were somehow excusable, the State continues, the record affirmatively rebuts Chambers's claim. See *Hodges*, 234 Ill. 2d at 16 (explaining that "[a]n example of an indisputably meritless legal theory is one which is completely contradicted by the record"). In the State's view, it is evident from the record of the sentencing hearing that the circuit court considered Chambers's youth and attendant circumstances, as *Miller*, if it were indirectly applicable, would have required. The court could consider the *Miller* factors only to the extent that the court was presented with evidence relevant to those factors. The transcript of the sentencing hearing affirmatively indicates that the court considered the evidence that had been presented. In the sentencing hearing, the court explicitly stated that it had considered Chambers's age and his statement in allocution and that it had reviewed the presentence investigation report and the defense exhibits (which laid out the evidence relevant to *Miller* factors).

¶ 79 The State has some reasonable points here. To support an as-applied challenge under the proportionate penalties clause, the young-adult offender must do more than cite "the 'evolving science' on juvenile maturity and brain development that formed the basis of the *Miller* decision." *People v. Thompson*, 2015 IL 118151, ¶ 38. Some form of additional "factual development" is necessary on the questions of (1) "how that science applies to the circumstances

of [the] defendant's case" and (2) "whether the rationale of *Miller* should be extended beyond minors under the age of 18." *Id.* Chambers contends, like the young-adult offender in *Harris*, that "the record here includes sufficient information about his personal history to allow the court to consider whether the evolving science on juvenile maturity and brain development relied upon in *Miller* applies to him." *Harris*, 2018 IL 121932, ¶ 42. The supreme court rejected that contention. Additional evidence was needed to show how that science applied specifically to the defendant and to the particular circumstances of his offense. *Id.* ¶ 46. The purpose of the attached "affidavits, records, or other evidence" required by section 122-2 of the Post-Conviction Hearing Act (725 ILCS 5/122-2 (West 2018)) is to show that such factual development is possible, that the claim is "capable of objective or independent corroboration." (Internal quotation marks omitted.) *Delton*, 227 Ill. 2d at 254.

¶ 80        In any event, apart from this question of corroboration, there is a well-established presumption that the sentencing court considered all of the mitigating factors, without the court's having to recite them or to assign a value to each factor presented in the sentencing hearing. *People v. Meeks*, 81 Ill. 2d 524, 534 (1980); *People v. Hill*, 408 Ill. App. 3d 23, 30 (2011). As we already have noted from *Buffer*, 2019 IL 122327, ¶ 27, a defendant seeking relief under the *Miller* line of cases "must show that *** the sentencing court failed to consider youth and its attendant characteristics"—a showing that, one might think, would entail more than observing that the court did not explicitly recite the *Miller* factors.

¶ 81        Thus, arguments can be made in favor of the summary dismissal. But arguments can be made against the summary dismissal too. Chambers cites decisions in which the appellate court allowed young-adult offenders to file successive postconviction petitions premised on *Harris* even though, apparently, the proposed successive petitions lacked any attached affidavits or other

evidence on "how the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision applie[d] to [the defendants'] specific facts and circumstances." *Harris*, 2018 IL 121932, ¶ 46; see *People v. Franklin*, 2020 IL App (1st) 171628, ¶ 72; *People v. Minniefield*, 2020 IL App (1st) 170541, ¶¶ 21, 44-45. Also, Chambers cites a decision in which the appellate court decided as follows: "Although the trial court commented on defendant's youth and upbringing *** and acknowledged that it [had] read defendant's [presentence investigation report] ***[,] we do not find these observations to be the equivalent to a full consideration of those special characteristics contained within the [presentence investigation] report." *People v. Morris*, 2017 IL App (1st) 141117, ¶ 32. So, in the extremely undemanding first stage of the postconviction proceeding, Chambers has a foothold in appellate court case law. All that we require of a *pro se* petition is that it be arguable (see *Hodges*, 234 Ill. 2d at 17), and to call the *pro se* petition in this case not arguable, we would have to call some decisions by the appellate court, *e.g.*, *Franklin*, *Minniefield*, and *Morris*, not arguable—which, of course, would be untenable.

¶ 82                                                 III. CONCLUSION

¶ 83             For the foregoing reasons, we reverse the circuit court's judgment and remand this case for further proceedings consistent with this opinion.

¶ 84             Reversed and remanded.

**No. 4-19-0151**

| | |
|---|---|
| **Cite as:** | *People v. Chambers*, 2021 IL App (4th) 190151 |
| **Decision Under Review:** | Appeal from the Circuit Court of McLean County, No. 14-CF-791; the Hon. Scott D. Drazewski, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Amy J. Kemp, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Don Knapp, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and Rosario David Escalera Jr., of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |